GONZALO RIVERA COLÓN, peticionario, *v.* DAVID DÍAZ AROCHO, GLORIA OTERO CÓRDOVA, la SOCIEDAD LEGAL DE GANANCIALES compuesta por ambos y OTROS, recurridos.

*Número:* CC-2004-0694 *Resuelto:* 26 de agosto de 2005

*Ernestina Martínez Guevara* y *Juan Carlos Puig Hernández*, abogados de la parte peticionaria; *Angelik Rodríguez Maldonado*, abogado de la parte recurrida.

La Juez Asociada Señora Rodríguez Rodríguez emitió la opinión del Tribunal.

Tenemos la ocasión para determinar si, probada la negligencia y el nexo causal con el daño, puede el titular de una finca afectada en sus recursos naturales reclamar una compensación en daños y perjuicios al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. De ser así, nos corresponde resolver cómo se caracteriza el daño a los recursos ambientales y cuál es el procedimiento adecuado para cuantificarlo. Examinemos detenidamente los hechos que dan lugar a este recurso.

I

El peticionario Gonzalo Rivera Colón, agricultor de profesión, es propietario de una finca localizada en el Barrio Hato Viejo del municipio de Ciales. Esta propiedad, de aproximadamente ciento treinta y ocho cuerdas (138.0479) de cabida, colinda por el noreste con dos inmuebles pertenecientes a los recurridos, David Díaz Arocho y su esposa Gloria Otero Córdova. La colindancia entre ambas propiedades está constituida por una elevación de aproximadamente trescientos pies lineales verticales, formados por un farallón natural o frontón calizo que se extiende a lo largo del Río Manatí, entre los municipios de Ciales y Manatí. La finca del peticionario se ubica en la parte inferior de dicha elevación, mientras que las propiedades de los recurridos se ubican en la parte superior.

El peticionario adquirió la referida propiedad con el propósito de desarrollar áreas de recreación pasiva y activa, el cultivo de frutos menores, la cría y pastoreo de ganado (agricultura general), y el desarrollo de bosques (ecoturismo). Con este ánimo, el señor Rivera edificó en un área de su propiedad un complejo, al que denominó Área Recreativa de Ciales, consistente en varias piscinas, salones de actividades y áreas recreativas. El señor Rivera obtenía ingresos por el alquiler de dichas instalaciones. En otra parte de la finca se localiza un área de bosque de al-

rededor de treinta cuerdas con caminos y veredas para fines ecoturísticos.

Durante los años 1990 a 1994, los recurridos realizaron en sus terrenos un movimiento de material de corteza terrestre, en virtud de un permiso otorgado por el Departamento de Recursos Naturales y Ambientales (D.R.N.A.). Ante una querella presentada en el D.R.N.A. en 1992, un oficial examinador determinó que los recurridos habían violado la operación del permiso al no tomar las medidas de seguridad necesarias para la protección de la ciudadanía y así evitar el depósito de material y sedimentación en las áreas bajas y en los desagües naturales. Ya que no surgió del expediente que se hubiera solicitado al D.R.N.A. una autorización para el uso de explosivos, el oficial examinador concluyó que el querellado quebrantó una prohibición expresa en el permiso en cuanto al uso de fulminantes.[1] Además, el oficial examinador precisó que algunas de las actividades de movimiento de corteza terrestre se efectuaron vencido el permiso del D.R.N.A.

Mientras tanto, el D.R.N.A. emitió una orden contra el señor Díaz Arocho mediante la cual ordenó que se llevaran a cabo trabajos preliminares de restauración en la propiedad del señor Díaz Arocho, específicamente en el borde del farallón y al pie del farallón en su parte baja. Para proceder con las labores de restauración, se le ordenó al señor Díaz Arocho obtener del señor Rivera un permiso de acceso a su propiedad para remover el material objeto del deslizamiento. El señor Rivera se negó a autorizar la entrada a su finca por entender que el daño sería mayor. Finalmente, el 15 de febrero de 1996 el Secretario del D.R.N.A. acogió el informe del oficial examinador y ordenó a los recurridos el pago de multas administrativas, ascendentes a cinco mil dólares.[2]

Así las cosas, el 14 de agosto de 1996, el señor Rivera

---

[1] Informe del Oficial Examinador, Departamento de Recursos Naturales y Ambientales, Apéndice, pág. 49.

[2] Resolución del Departamento de Recursos Naturales y Ambientales, Apéndice, pág. 35.

presentó una demanda en daños y perjuicios contra el señor Díaz Arocho, su esposa y la sociedad legal de gananciales formada por éstos, y varias aseguradoras. Adujo en la demanda que la utilización de equipo pesado y explosivos en el proceso de extracción de terreno tuvo consecuencias devastadoras en su propiedad, al ocasionar grandes desplomes de la pared de farallón que marca la colindancia. Estimó que los daños sufridos incluían la destrucción y completa inutilización de un área de bosque de alrededor de diez cuerdas, incluyendo caminos y veredas; pérdida de hábitat de aves y otras especies de animales; destrucción de árboles; alteración del flujo natural de las aguas superficiales y subterráneas, incluyendo manantiales; alteración y destrucción de cuevas y cavernas en la pared del farallón; interrupción e inutilización del área del bosque; interrupción del uso del área recreativa, y daño ecológico general.[3] En consecuencia, se reclamó un millón cuatrocientos mil dólares en concepto de daños a la propiedad, daños morales y angustias mentales sufridos por el señor Rivera al ver destrozada parte de su propiedad y ver paralizados sus proyectos.[4]

Luego de varios incidentes procesales se celebró una

---

[3] Demanda Civil Núm. CDP1996-0235, Apéndice, pág. 28.

[4] Según surge de la demanda, el desglose de los daños reclamados es el siguiente:

"23. El Demandante como consecuencia directa de la culpa o negligencia de los Codemandados, ha sufrido los siguientes daños:

"a)Daños a la Propiedad del Demandante:
— destrucción y completa inutilización (sic) de un área de bosque de alrededor de 10, cuerdas incluyendo caminos y veredas ................. $200,000
— pérdida de hábitat de aves y otras especies de animales, incluyendo árboles ...................................................................................$100,000
— la alteración del flujo natural de agua superficial, subterránea y manantiales ............................................................................$100,000
— alteración y destrucción de cuevas y cavernas en la pared del farallón ...................................................................................$100,000
— interrupción e inutilización del área del bosque ............................$200,000
— interrupción del uso del área recreativa .........................................$400,000
— daño ecológico y escénico general .....................................................$200,000
"b)Daño a la persona del Demandante:
— daños morales, sufrimientos y angustias mentales .........................$200,000"
Apéndice, pág. 62.

vista en los méritos en la que testificaron el señor Rivera, el perito Carlos Conde Costas y el demandado señor Díaz Arocho.([5]) Mediante su testimonio, el señor Rivera describió en detalle su propiedad y todas las actividades cívicas allí celebradas previo a los derrumbes.([6]) Testificó sobre los trabajos de extracción en las propiedades vecinas y cómo éstos afectaron el disfrute de su propiedad, causándole daños físicos, económicos y angustias mentales.([7])

Además del testimonio del señor Rivera, la parte demandante presentó como perito al señor Conde Costas, director ejecutivo de Tierra Linda, Inc., corporación sin fines de lucro dedicada a estudios ecológicos y a promover la educación ambiental y el ecoturismo. El señor Conde testificó que en 1996 Tierra Linda, Inc. realizó un reconocimiento y evaluación ecológica del área impactada por el derrumbe en la parte del farallón localizada en la propiedad del demandante, que incluyó el área del bosque que ubica en la base de dicho farallón, dentro de la finca del señor Rivera. Para el análisis se utilizó personal técnico y especializado, quienes hicieron un estudio detallado de la geología, hidrología, fisiografía, geoestética, flora y fauna del lugar, y de cómo estas áreas quedaron adversamente afectadas por el derrumbe en la propiedad colindante. Se preparó un informe escrito que pormenorizó todos los hallazgos del mencionado estudio.([8]) El perito manifestó la importancia ecológica y enfatizó el valor geoestético del

---

([5]) Las partes estipularon la exposición narrativa de la prueba testifical. Véase Apéndice, pág. 413.

([6]) En su testimonio mencionó distintos grupos cívicos que, además del público en general que visitaba el bosque, rentaban los recursos de la propiedad, como por ejemplo "Boys Scouts of America", grupos religiosos, usuarios de kayaks y deportistas, entre otros.

([7]) Surge de la Estipulación de la Exposición Narrativa de la Prueba Testifical, que no se hizo un inventario de los árboles afectados, una tasación de la propiedad ni un estudio de daños económicos, ni se presentó prueba documental de pérdida de ingresos.

([8]) El informe titulado Reconocimiento y Evaluación de Área Impactada por Derrumbe, Finca Rivera Colón, Barrio Hato Viejo, Ciales, Puerto Rico, fue admitido en su totalidad en evidencia por el Tribunal de Primera Instancia. Véase Apéndice, pág. 67.

área, la que identificó como un refugio de vida silvestre. Concluyó que el daño causado al paisaje cársico puede considerarse como permanente y que el área de bosque impactado tardaría alrededor de quince años para recuperarse. La parte demandada no presentó prueba pericial para refutar la del demandante.

Así las cosas, el 31 de julio de 2003 el Tribunal de Primera Instancia dictó sentencia en la que declaró "sin lugar" la demanda y ordenó el archivo y sobreseimiento del caso. Sostuvo el tribunal sentenciador que el demandante no había presentado prueba suficiente para cuantificar los daños, por cuanto le era imposible conceder una indemnización descansando en estimados verbales, en ausencia de prueba objetiva para sustentarlos. En apelación, el Tribunal de Apelaciones confirmó el dictamen bajo el mismo fundamento del tribunal de instancia, a saber, que a pesar de probarse la negligencia de los demandados y la existencia de los daños, no se probó su valor. Como resultado, rehusó fijar una compensación "sobre bases especulativas y arbitrarias".

No conforme con la determinación del foro intermedio, el señor Rivera nos solicitó que revisemos la sentencia dictada a los efectos de concederle una indemnización justa y razonable por los daños probados a satisfacción del tribunal sentenciador. En su escrito presentó los señalamientos de error siguientes:

> 1. Erró el Tribunal [de Apelaciones] al confirmar la determinación del Tribunal de Primera Instancia al no conceder cuantía monetaria en carácter indemnizatorio, no obstante haberse probado los siguientes daños alegados: daños ambientales, geoestéticos o escénicos y angustias mentales sufridas por el peticionario.
> 2. Erró el Tribunal [de Apelaciones] al concluir que era necesaria prueba objetiva para valorar el importe de los daños ambientales, geoestéticos o escénicos y las angustias mentales sufridas, reclamadas y probadas por el peticionario.
> 3. Erró el Tribunal de Apelaciones al confirmar la determinación del Tribunal de Primera Instancia al interpretar que el peticionario no aportó prueba sobre el importe de pérdida de ingresos. Petición de *certiorari*, págs. 5–6.

Expedimos el auto solicitado y, contando con la comparecencia de las partes, resolvemos.

## II

Por estar íntimamente relacionados, procedemos a discutir los señalamientos de error en conjunto.

■ El Art. 1802 del Código Civil de Puerto Rico, *supra*, consagra la obligación de reparar daños causados mediante culpa o negligencia.([9]) Al interpretar el referido artículo, hemos señalado que para que surja la responsabilidad extracontractual deben concurrir los tres elementos siguientes: un daño, una acción u omisión negligente o culposa, y la correspondiente relación causal entre ambos. *Toro Aponte v. E.L.A.*, 142 D.P.R. 464 (1997); *Ramírez v. E.L.A.*, 140 D.P.R. 385 (1996), y otros casos allí citados.

■ La culpa o negligencia es la falta del debido cuidado, que consiste en no anticipar ni prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias. *Toro Aponte v. E.L.A.*, supra; *Ramos v. Carlo*, 85 D.P.R. 353 (1962). Existe un deber de conducta correcta, aunque no prescrita en los códigos, que constituye el presupuesto mínimo sobreentendido en el orden social. Son los tribunales los que habrán de determinar en qué consiste el deber de cuidado, tomando en cuenta las circunstancias de cada caso. *Ramos v. Carlo*, supra.

■ El concepto *culpa* del Art. 1802, *supra*, es infinitamente abarcador, tanto como lo suele ser la conducta humana, por cuanto ésta se analiza con amplitud de criterio. *Toro Aponte v. E.L.A.*, supra; *Santini Rivera v. Serv Air,*

---

([9]) El Art. 1802 del Código Civil dispone:
"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización." 31 L.P.R.A. sec. 5141.

*Inc.*, 137 D.P.R. 1 (1994); *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970). Conforme a nuestra tradición civilista, hemos adoptado como medida del deber de cuidado el estándar objetivo del buen padre de familia, que corresponde a la persona prudente y razonable en el derecho común anglosajón. Bajo ese estándar, se exige la diligencia que emplearía un ser humano promedio, frente a las mismas circunstancias, para prever el daño y tomar medidas para evitar ese resultado dañoso. *Valle v. E.L.A.*, 157 D.P.R. 1 (2002).

■ El elemento de la previsibilidad está intrínsicamente relacionado al de la causalidad. En nuestra jurisdicción rige la doctrina de la causalidad adecuada para determinar si, de hecho, existe algún tipo de relación entre el daño causado y el acto culposo o negligente. Conforme a esta doctrina, se considera causa aquella condición que ordinariamente produciría el daño según la experiencia general, cuando ese daño aparece como consecuencia razonable y ordinaria del acto. *Toro Aponte v. E.L.A.*, supra; *Soto Cabral v. E.L.A.*, 138 D.P.R. 298 (1995); *Torres Trumbull v. Pesquera*, 97 D.P.R. 338 (1969). La relación causal —elemento imprescindible en una reclamación en daños y perjuicios— es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico.

### III

Con el anterior trasfondo doctrinal sobre la responsabilidad extracontractual, pasemos a analizar si procede su aplicación en el marco de derecho ambiental.

■ La protección del medio ambiente representa una preocupación de importancia trascendental en el ámbito mundial por sus implicaciones humanas, sociales y económicas. Es política pública de los estados proteger el disfrute de un medio ambiente que fomente el desarrollo de la persona y una mejor calidad de vida. C.J. Lorente Aznar, *Empresa, derecho y medio ambiente: la responsabi-*

*lidad legal empresarial por daños al medio ambiente: normativa básica ambiental*, Barcelona, Ed. Bosch, 1996, pág. 18. El medio ambiente, como concepto, no se circunscribe a los recursos naturales y organismos vivos, sino que abarca otra serie de aspectos culturales, históricos y arqueológicos, entre otros. Íd.

La normativa ambiental es una de las más amplias, complejas y diversas áreas del Derecho, ya que tiene implicaciones de naturaleza administrativa, penal o civil. Por la multiplicidad de vertientes que abarca, en las últimas décadas se han aprobado normas constitucionales y legislado un sinnúmero de estatutos y disposiciones al nivel internacional en aras de proteger el ambiente.[10]

En nuestro ordenamiento la protección de los recursos naturales ostenta rango constitucional. Los constituyentes, preocupados por la conservación de nuestros recursos, consideraron necesario recoger expresamente el deber ineludible de proteger el medio ambiente, así como el derecho de todo ser humano al goce y disfrute de los recursos naturales. 4 Diario de Sesiones de la Convención Constituyente 2622 (1952). A tales efectos, el Art. VI, Sec. 19 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1999, pág. 421, preceptúa que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". Esta cláusula categórica e incondicionada no deja lugar a dudas que en nuestra jurisdicción es

---

[10] A manera de ejemplo, en la doctrina angloamericana existen varios estatutos federales que reconocen la facultad de valorar el daño ecológico y ordenar a la parte actora a indemnizarlo. Son los más importantes el *Comprehensive Environmental Response, Compensation, and Liability Act* (CERCLA), 42 U.S.C.A. sec. 9607(a); el *Clean Water Act* (CWA), 33 U.S.C.A. sec. 1321(f)(4)-(5), y el *Oil Pollution Act* (OPA), 33 U.S.C.A. sec. 2702(a). Cada una de estas piezas legislativas lleva apareada una reglamentación que conceptúa diferentes y complejos modelos de cuantificación para identificar y estimar los daños ambientales y así determinar la compensación adecuada. Esta reglamentación se conoce como *National Resources Damage Assessment* (NRDA) y, en términos generales, está diseñada con el propósito principal de reestablecer los recursos naturales a su condición natural de no haber ocurrido el daño.

política pública de carácter ineludible salvaguardar el ambiente. Este mandato dual impone el deber de lograr la más eficaz conservación de los recursos naturales, a la vez que promueve su desarrollo para el beneficio de la ciudadanía general. Véanse: *Colón Cortés v. Pesquera*, 150 D.P.R. 724 (2000); *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908 (1998).

Para implantar adecuadamente este mandato, durante las últimas décadas se ha legislado una serie de mecanismos tutelares. En 1970 se aprobó la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 *et seq.*), con el fin primordial de brindar contenido procesal y sustantivo a la disposición constitucional, y en cuya virtud surgió la Junta de Calidad Ambiental. Posteriormente, se aprobó una importante legislación ambiental[11] y se formó un complejo esquema agencial para reglamentar lo relacionado a la protección de los recursos naturales y el disfrute del medio ambiente.[12] Véase *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433 (1992).

Por ser la temática del derecho ambiental tan diversa, los planteamientos relacionados al medio ambiente se evalúan de acuerdo con la naturaleza de la reclamación. Ante reclamaciones civiles, en la doctrina angloamericana, la litigación ambiental privada sobre daños ambientales se circunscribe a reclamaciones basadas en el derecho de propiedad. En estas situaciones se reclama por daño físico a recursos ambientales como árboles, cosechas o animales de los que sea posible probar un derecho propietario. Son

---

[11] Entre estas leyes se encuentran, además de la Ley de Política Pública Ambiental, la Ley Orgánica del Departamento de Recursos Naturales, Ley Núm. 23 de 20 de junio de 1972; la Ley de Bosques, Ley Núm. 133 de 1 de julio de 1975; la Ley para Reglamentar la Extracción de Corteza Terrestre, Ley Núm. 132 de 25 de junio de 1968; la Ley de Cuevas y Cavernas, Ley Núm. 111 de 12 de julio de 1985; la Nueva Ley de Vida Silvestre de Puerto Rico, Ley Núm. 241 de 15 de agosto de 1999, entre otras leyes especiales.

[12] Además de la legislación local, la legislación federal también aplica a Puerto Rico. Como resultado, es tan abundante la legislación ambiental existente que el estudio de esta rama del derecho es sumamente complejo.

muy pocas las ocasiones en que una parte afectada puede acreditar interés propietario en recursos naturales como el aire, agua, especies marinas o vida silvestre, para fundamentar un reclamo en daños por estos recursos. C.B. Anderson, *Damage to Natural Resources and the Costs of Restoration*, 72 (Núms. 2–3) Tul. L. Rev. 417, 419 (1997).([13])

En la jurisdicción norteamericana, acreditado el interés propietario, las reclamaciones por daños ecológicos pueden basarse en varias teorías de derecho común, entre ellas estorbo (*nuisance*),([14]) trasgresión (*trespass*),([15]) responsabilidad absoluta([16]) o negligencia. Cuando el reclamo es por negligencia, es determinante establecer los elementos para probar una relación causal entre la conducta del demandado y el daño experimentado, conforme al estándar de cuidado de la persona razonable. Véanse: *Alegría v. Payonk*, 619 P.2d 135 (Idaho 1980); *Brizendi v. Nampa Meridian Irrigation District*, 548 P.2d 80 (Idaho 1976). El elemento de causalidad se prueba bajo los mismos criterios tradicionales que gobiernan las reclamaciones torticeras.([17])

---

([13]) No obstante, como discutiremos más adelante, cuando el daño recae sobre recursos naturales existentes en la propiedad del perjudicado, se considera la indemnización por daños por la interferencia con el disfrute de la propiedad (daños morales). Véanse: *Nitram Chemicals, Inc. v. Parker*, 200 So.2d 220 (Fla. App. 1967); *Alonso v. Hills*, 214 P.2d 50 (Cal. App. 1950).

([14]) Las reclamaciones por *nuisance* se fundan en la interferencia irrazonable con el uso y disfrute de la propiedad, y constituyen la causa más común en demandas privadas de carácter civil por daños con implicaciones ambientales. Véanse: *Mel Foster Co. Prop. v. American Oil Co.*, 427 N.W.2d 171 (Iowa 1988); *Frank v. Environmental Sanitation Management*, 687 S.W.2d 876 (Mo. 1985); *Patz v. Farmegg Products, Inc.*, 196 N.W.2d 557 (Iowa 1972).

([15]) Una acción por trasgresión consiste en un reclamo ante una invasión ilegal intencional a la propiedad. Véase: *Regan v. Cherry Corp.*, 706 F.Supp. 145 (D. R.I. 1989); *Curry Coal Company v. Arnoni Company*, 266 A.2d 678 (Pa. 1970).

([16]) En estas situaciones se impone responsabilidad independientemente de la conducta del actor, de acuerdo con los elementos proscritos en el 3 *Restatement of Torts 2d* Sec. 519 *et seq.* (1977). Este tipo de reclamación en la litigación ambiental se limita a daños tóxicos o que involucren sustancias radioactivas. Véanse: *Crawford v. National Lead Co.*, 784 F.Supp. 439 (S.D. Ohio 1989); *State, Depar. of Environ. Protect. v. Ventron*, 468 A.2d 150 (N.J. 1983); *Branch v. Western Petroleum, Inc.*, 657 P.2d 267 (Utah 1982).

([17]) Resulta necesario probar los siguientes elementos para que prospere la acción: un deber legal existente de ajustarse a cierto estándar de conducta; que el actor

En España, de igual modo, la materia de responsabilidad civil medioambiental alcanza su aplicación práctica bajo el precepto general del Art. 1902 del Código Civil de España, el cual corresponde a nuestro Art. 1802, *supra*. La interpretación de la doctrina y la jurisprudencia española para este tipo de planteamientos se inspira en gran parte en el principio de la culpa de dicho artículo. En épocas más recientes se distingue cierta influencia de los preceptos de la responsabilidad absoluta, que considera procedente la indemnización independientemente de la culpa.([18]) No obstante esta reciente tendencia, en la gran mayoría de los casos en que se invoca la protección del medio ambiente en la esfera del derecho sustantivo privado, se requiere la ocurrencia de responsabilidad que emane de forma más o menos directa de la voluntad del actor. J. Santos Briz, *La Responsabilidad Civil, Temas Actuales*, Madrid, Ed. Montecorvo, 2001, págs. 88–98.

En nuestra jurisdicción, ya habíamos expresado que nuestro Art. 1802, *supra*, constituye una norma general para reparar todo tipo de daño ilícito, "incluso cuando la actuación culposa contraviene intereses garantizados por la Constitución". *Bonilla v. Chardón*, 118 D.P.R. 599, 611 (1987). Por lo tanto, conforme a la discusión que antecede, resolvemos que en nuestra jurisdicción una acción civil al amparo del Art. 1802 es un mecanismo adecuado para que una persona privada reclame por daños cuando éstos ocurren a los recursos medioambientales existentes en su propiedad como consecuencia de un acto negligente de otro, independientemente de los mecanismos provistos en la legislación especial.([19])

---

falló en conformarse a ese estándar; un nexo causal entre la conducta negligente y el daño, y un daño a los intereses del reclamante. *O'Neal v. Department of Army*, 852 F.Supp. 327 (M.D. Pa. 1994); *Jacques v. First Nat'l Bank*, 515 A.2d 756 (Md. 1986).

([18]) Cabe destacar que estos supuestos de responsabilidad absoluta —en los que sólo se excluye responsabilidad por circunstancias de fuerza mayor— se dan ante reclamos particulares al amparo del Art. 1908 del Código Civil español, Art. 1808 de nuestro Código Civil, 31 L.P.R.A. sec. 5147.

([19]) Es importante aclarar que existen mecanismos alternos en virtud de legis-

A estos efectos, definimos el daño ambiental, al que denominamos indistintamente como "daño ecológico", como aquel daño "sufrido por el medio ambiente que, como consecuencia de accidentes humanos, más o menos voluntarios, afecta el equilibrio natural". Santos Briz, *op. cit.*, pág. 107. (Para la definición de "medio ambiente", véase discusión en pág. 11.) En este tipo de acción será indispensable probar los elementos necesarios para establecer la responsabilidad extracontractual, específicamente: una acción negligente u omisión del supuesto responsable, un daño ecológico o deterioro causado a los recursos ambientales existentes en la propiedad privada, y una relación de causalidad entre ambos. La responsabilidad civil resultante no será objetiva, sino que dependerá de que se pruebe la negligencia del demandado.

## IV

A. Habida cuenta que la responsabilidad civil conlleva precisamente el deber de resarcir a la parte perjudicada por el daño causado, procede determinar cómo se caracteriza el daño ambiental, para así poder valuar la indemnización adecuada para la parte afectada. En este análisis no podemos perder de vista que, al ser un estatuto reparador, el Art. 1802, *supra*, debe interpretarse liberalmente para lograr su propósito. Véanse: *Dorante v. Wrangler of P.R.*, 145 D.P.R. 408 (1998); *Muñoz Hernández v. Policía de P.R.*, 134 D.P.R. 486 (1993).

Como ya indicamos, uno de los elementos de la responsabilidad extracontractual es un daño causado. Luis Díez-Picazo define *daño* como "el menoscabo que a conse-

___

lación especial que provee expresamente al ciudadano una causa de acción civil. A manera de ejemplo, el Art. 19 de la Ley sobre Política Pública Ambiental dispone que

"[c]ualquier persona natural o jurídica podrá llevar acciones en daños y perjuicios en los tribunales de justicia contra cualquier otra persona natural o jurídica basada en daños que sufran por violaciones a las secs. 1121 a 1140a de este título. Esta acción civil será independiente y diferente de los procesos administrativos que se sigan en la Junta." 12 L.P.R.A. sec. 1139.

cuencia de un acaecimiento o evento determinado sufre una persona ya en sus bienes vitales o naturales, ya en su propiedad o en su patrimonio". L. Díez-Picazo, *Derecho de Daños*, Madrid, Ed. Civitas, 1999, pág. 307. Según bien refleja la anterior definición, al igual que el concepto de *culpa*, el concepto *daño* resulta ser sumamente abarcador, por la variedad de matices que abarca. Santos Briz, *op. cit.*, pág. 146.

Nuestro ordenamiento jurídico reconoce la existencia de dos tipos de daños. *Cintrón Adorno v. Gómez*, 147 D.P.R. 576 (1999). Por un lado, se encuentran los *daños especiales* —también conocidos como daños físicos, patrimoniales, pecuniarios o económicos— que son toda aquella pérdida que recae sobre bienes objetivos. Estos daños admiten la valoración económica por impactar directamente el patrimonio del perjudicado. J. Santos Briz, *Derecho de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, pág. 120. De otro lado, existen los llamados *daños morales*, que son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado. Es decir, son los daños que lesionan "los derechos de la personalidad o extra patrimoniales". R. De Ángel Yagüez, *La Responsabilidad Civil*, Bilbao, Universidad de Deusto, 1988, pág. 224. En igual sentido, véase M. Carneiro, *Método de valuación del daño moral*, Buenos Aires, Ed. Hammurabi, Argentina, 2001, pág. 61 ("El daño moral es de naturaleza extrapatrimonial, emocional y simbólica. Se exterioriza por el sufrimiento, el dolor y la humillación"); A. Borrell Macia, *Responsabilidades derivadas de la culpa extracontractual civil*, 2da ed., Barcelona, Ed. Bosch, 1955, pág. 211. El daño moral lesiona los bienes no económicos de la persona pero, a pesar de no recaer directamente sobre el patrimonio, indirectamente podrían repercutir en éste, causando una perturbación anímica en su titular. *Cintrón Adorno v. Gómez*, supra.

Por su naturaleza heterogénea, los daños morales no pueden ser clasificados con carácter exhaustivo. La doctrina identifica entre estos daños, los daños propia-

mente morales —que no afectan de modo alguno el patrimonio— y los daños morales impropios, llamados también "daños patrimoniales indirectos", que trascienden a valores del patrimonio. Santos Briz, *Derecho de Daños, op. cit.*, págs. 120–122. Además, nos comenta Santos Briz que

> [p]uede hablarse también de daños morales derivados de daños patrimoniales, así por ejemplo el dolor moral que produce la pérdida de una joya familiar; de daños morales derivados de dolores físicos o de enfermedades físicas o mentales, *y de daños morales concomitantes con daños patrimoniales o a la inversa.* Todos ellos tienen de común producir perturbaciones anímicas (disgusto, desánimo, desesperación, pérdida de la satisfacción de vivir, etcétera), pero derivan de motivos distintos. (Énfasis nuestro.) Íd., pág. 122.

En *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449, 461–462 (1995), afirmamos que "[e]l medio ambiente natural y la naturaleza no sólo sirven el propósito de que el hombre pueda utilizarlos para su subsistencia material, sino para su recreación y uso del tiempo libre, para la contemplación de su belleza y majestuosidad, para sentirse orgulloso de su patria, para mejorar su calidad de vida y para lograr un desarrollo integral de la personalidad y su autorrealización como ser humano". De acuerdo con la apreciación que hiciéramos en *este caso, resolvemos que el daño ambiental, cuando tiene la naturaleza de daño a un paisaje con valor ecológico que afecta la propiedad del reclamante, debe caracterizarse como un daño moral.*

Ahora bien, en la medida en que el daño ambiental afecte el patrimonio del perjudicado, deberá considerarse como daño especial. En consecuencia, concluimos que este tipo de daño ambiental tiene la naturaleza de daño moral concomitente con daño patrimonial. Como veremos, esta distinción tiene efectos prácticos al momento de valuar la compensación, según discutimos a continuación.

B.

i. La doctrina civilista admite dos posibilidades para reparar un daño: la reparación *in natura* o

reintegración específica, que es considerada la solución ideal, o la indemnización monetaria, que es la alternativa cuando el restablecimiento al estado natural no es posible. De Ángel Yagüez, *op. cit.*, pág. 321. Le corresponde al tribunal determinar la forma en que procede la reparación, considerando las características particulares de cada caso. *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985). Véase, también, H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. JTS, 1986, págs. 430–431. Cabe señalar que hemos reconocido que la estricta aplicación de la norma de reparación *in natura* resulta de difícil —y en ocasiones imposible— aplicación,[20] lo que generalmente lleva a los tribunales a optar por la alternativa de la indemnización en dinero, que resulta menos compleja. *Rodríguez Cancel v. A.E.E.*, supra.

Conforme a lo anterior, cuando no es posible la reintegración resulta imperativo asignar una cuantía económica al daño sufrido. Debemos apuntar que el daño debe ser resarcido íntegramente. Previamente nos hemos expresado sobre la angustiosa función que tienen los tribunales al estimar y valorar los daños. *Rodríguez Cancel v. A.E.E.*, supra. Conceder cuantías insuficientes en concepto de daños tiene el efecto de aminorar la responsabilidad civil a la que debe estar sujeta el causante del daño, mientras que conceder daños exagerados conlleva un elemento punitivo, no reconocido por nuestro ordenamiento. Por lo tanto, al adjudicar la cuantía, el tribunal debe procurar alcanzar una razonable proporción entre el daño causado y la indemnización otorgada. *Nieves Cruz v. U.P.R.*, 151 D.P.R. 150 (2000).

Ante reclamaciones de daños físicos a la propie-

---

[20] El tratadista Ricardo De Ángel Yagüez, en su obra *La Responsabilidad Civil*, Bilbao, Universidad de Deusto, 1988, pág. 321, nos indica:

"La reparación en forma específica consiste en la remoción de la causa del daño y en la realización de la actividad necesaria para reponer las cosas o bienes dañados en su estado primitivo. Puede ocurrir, desde luego, que una y otra finalidad sean imposibles o que resulten ya inútiles o insatisfactorias, o que requieran la intervención insustituible e inalcanzable de un tercero." (Énfasis y escolios omitidos.)

dad, es necesario que el demandante provea al tribunal los datos necesarios para poder cuantificar el daño reclamado y así fijar la indemnización correspondiente. *Sánchez v. Cooperativa Azucarera*, 66 D.P.R. 346 (1946). En efecto, al reclamar daños especiales, nuestro ordenamiento jurídico requiere que se detalle el concepto de las partidas afectadas para así cuantificar toda consecuencia al patrimonio. 32 L.P.R.A. Ap. III, R. 7.4.[21] *Sin embargo, hemos reiterado que aún ante daños especiales, el derecho a ser compensado no se derrota por el carácter especulativo de la reclamación. S.L.G. v. F.W. Woolworth & Co.*, 143 D.P.R. 76 (1997); *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985). Aun presente cierto grado de incertidumbre, el tribunal podrá, conforme a los hechos particulares del caso, la prueba presentada y los criterios establecidos, determinar una cuantía razonable para indemnizar al perjudicado por los daños sufridos. *Rivera v. Tiendas Pitusa, Inc.*, 148 D.P.R. 695, 700 (1999); *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978).

Por otro lado, la determinación o cuantificación de daños morales, tarea que ha sido descrita como uno de los "desafíos más delicados que plantea hoy la tarea judicial", no debe descansar en datos materiales y prueba puramente objetiva. R.D. Pizarro, *Daño Moral*, 2da ed., Buenos Aires, Ed. Hammurabi, 2004, pág. 436. Es un ejercicio que tolera cierto grado de especulación ya que descansa, a mayor grado que los daños especiales, en elementos subjetivos como lo son la discreción, el sentido de justicia y la conciencia humana del juzgador de los hechos. *S.L.G. Rodríguez v. Nationwide*, 156 D.P.R. 614 (2002); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975).

Ahora bien, al valuar y mensurar los daños el juzgador debe hacerlo en estricta correlación con la

---

[21] La Regla 7.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que "[c]uando se reclamen daños especiales, se detallará el concepto de las distintas partidas".

prueba presentada, procurando mantener un sentido remediador sin aproximarse al elemento punitivo. *S.L.G. v. F.W. Woolworth & Co.*, supra. En *Hernández v. Fournier*, 80 D.P.R. 93, 103 (1957), dispusimos que para que proceda una reclamación por daño moral "es imprescindible probar sufrimientos y angustias morales profundas y no bastaría una pena pasajera como base de la acción". Por esto hemos reiterado que el reclamante debe proveer evidencia que sustente que realmente quedó afectado en su salud, bienestar y felicidad. Véanse: *Blás v. Hospital Guadalupe*, 146 D.P.R. 267 (1998); *Moa v. E.L.A.*, 100 D.P.R. 573 (1972); *Ramos Rivera v. E.L.A.*, 90 D.P.R. 828 (1964).

El daño moral no se puede convertir en una fuente de lucro indebido para el damnificado y en motivo de expoliación para el dañador, lo que ocurre "cuando este último es obligado a reparar daños morales, inexistentes, que no guardan relación causal adecuada con el hecho generador, o lo que es más frecuente, cuando se encubre bajo el ropaje de daño moral a daños patrimoniales que no han sido probados en juicio". Pizarro, *op. cit.*, pág. 432.

ii. La complejidad inherente a la cuantificación de daños en una reclamación al amparo del Art. 1802, *supra*, es patente cuando se reclaman daños ecológicos a recursos naturales existentes en una propiedad privada. Estudiosos del derecho ambiental en España destacan que ocurrido el daño ambiental se hace normalmente imposible la reparación *in natura*. Por ser así, la jurisprudencia española en materia civil de daño ambiental tiende hacia el resarcimiento directo de daños a la propiedad o a la salud. No obstante, por las cualidades inherentes a los recursos naturales, no está claramente definido qué elementos son compensables y cuáles son los métodos de valoración apropiados. Distinto ocurre en el campo penal o administrativo, donde la tendencia es hacia la reparación. M. Cuiñas Rodríguez, *Acerca de la tutela del ambiente en el derecho español*, en C. Weingarten, *Daños—medio ambiente,*

*salud, familia, derechos humanos*, Buenos Aires, Editores Rubizal-Culzoni, 2000, pág. 144.

■ Igualmente, en Estados Unidos la legislación de carácter administrativo busca la restauración (*restoration*), cuyo objetivo es devolver los recursos naturales a la condición original (*baseline*).[22] *Restauración* es el término colectivo utilizado para referirse a los costos asociados a toda actividad dirigida a rehabilitar, reemplazar o adquirir el equivalente funcional al recurso ecológico afectado. Véanse: S. Master, *Natural Resource Damage Assessment*, 2000 Natural Resources Env't, 114, 118; *City of Anderson v. Salling Concrete Corp.*, 411 N.E.2d 728 (Ind. 1980). Pero cuando se trata de un reclamo torticero, no hay una fórmula determinada para calcular el daño, sino que los tribunales varían considerablemente sobre la manera de determinar su valor y el tipo de prueba necesaria para adjudicarlos. Cada caso se examina de forma independiente y de acuerdo con sus hechos particulares. *Casinos v. Union Oil Co.*, 14 Cal. App. 4th 1770 (Cal. App. 1993); *Givens v. Markall*, 124 P.2d 839 (Cal. App. 1942) ("There is no fixed rule for determining the measure of damages for injuries to, or destruction of, property in every case. The amount to be awarded depends upon the character of the property and the nature and extent of the injury, and the mode and amount of proof must be adapted to the facts of each case.") En el sano ejercicio de su discreción, el tribunal debe permitir a un propietario recobrar indemnización no sólo por la pérdida de uso de la propiedad, sino además por otras lesiones como alteraciones al estado anímico y enfermedades físicas. *Weld County Board of County Com'rs v. Slovek*, 723 P.2d 1309 (Colo. 1986).

Para llevar a cabo esta función, los tribunales en la jurisdicción norteamericana han esbozado diferentes modelos de cuantificación de daños. El mecanismo de restauración, utilizado generalmente en la esfera administrativa,

---

[22] CERCLA, 42 U.S.C.A. sec. 9607(f)(1).

tiene cabida en reclamos civiles cuando los daños son de carácter temporero y de naturaleza tal que permitan regresar la propiedad a su estado original. En estos casos la compensación consiste en el costo de la reparación. *Horsch v. Terminix Intern Co.*, 865 P.2d 1044 (Kan. App. 1993). Otro modelo consiste en indemnizar de acuerdo con la disminución en valor (*diminution in value rule*), que se calcula comparando la diferencia en el valor de la propiedad justo antes y justo después del daño. *McAlister v. Atlantic Richfield Co.*, 662 P.2d 1203 (Kan. 1983); *Bayley Products, Inc. v. American Plastic Prod. Co.*, 186 N.W.2d 813 (Mich. App. 1971). Este segundo modelo se utiliza por lo general cuando el daño a la propiedad es permanente, pero no la destruye en su totalidad. Sin embargo, un reclamo sobre propiedad inmueble no necesariamente puede caracterizarse como permanente. Para que se considere permanente no es necesario que el daño dure para siempre; es suficiente que sea una pérdida irreparable para el propietario. *Hudson v. Peavey Oil Co.*, 566 P.2d. 175 (Or. 1977). También, por lo general, se usa el modelo de disminución en valor cuando el daño es continuo o recurrente, como lo sería la contaminación industrial. *Razzano v. Kent*, 177 P.2d 612 (Cal. App. 1947).

En ocasiones los tribunales utilizan una teoría híbrida, que toma en consideración tanto el costo razonable de reparación como la regla de disminución en valor. En este caso, el cálculo de la merma en valor se hace luego de la reparación, compensándose así bajo ambos modelos. Para que proceda este modelo híbrido es necesario que el demandante pruebe que las medidas remediales no lograron devolver la propiedad a su anterior valor en el mercado. Véanse: *Terra-Products, Inc. v. Kraft General Foods*, 653 N.E.2d 89 (Ind. App. 1995); *Wiese-GMC, Inc. v. Wells*, 626 N.E.2d 595 (Ind. App. 1993).

Ahora bien, cabe la posibilidad de que el valor en el mercado de la propiedad no haya experimentado una reducción luego del daño. Ante esta situación, los tribunales reconocen que muchas áreas de considerable valor ecoló-

gico tienen muy poco o ningún valor comercial, de manera que una aplicación literal del modelo de disminución en valor dejaría al reclamante carente de remedio. Es improcedente en estos casos cuantificar la compensación utilizando modelos comerciales basados en el valor en el mercado. *Com. of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 674 esc. 21 (1er Cir. 1980) ("The diminution rule has itself been limited in cases where the property has a special value to the injured party that is not reflected in its market value").

Un tercer modelo de cuantificación de daños consiste en calcular el valor de la pérdida de uso de la propiedad. Este método generalmente usa como base el valor rentable de la propiedad, valor que hubiera podido rentarse a no ser por el daño ambiental. Este modelo está supeditado a condiciones de valor comercial, con las desventajas ya mencionadas. *Spaulding. v. Cameron*, 239 P.2d 625 (Cal. 1952). Otro método, denominado "costo de reemplazo", provee una alternativa viable cuando resulta razonable obtener sustitución para los elementos afectados, y así compensar la pérdida. Este mecanismo resulta apropiado cuando es posible reemplazar la fauna o vegetación con nuevas especies. Se utiliza para restaurar bosques o especies de animales que no se entienda que puedan regenerarse naturalmente en un término razonable de tiempo. *Com. of Puerto Rico v. SS Zoe Colocotroni*, supra, pág. 677.

Como mencionamos, la cuantificación del daño depende en gran medida de la naturaleza de la propiedad destruida o lesionada. Ocasionalmente la pérdida afecta elementos adheridos al suelo, que pueden valorarse independientemente del terreno. En estos casos, procede cuantificar estos elementos por separado. El tribunal determinará, en su sana discreción, si procede indemnizar por los elementos individuales, por el valor del terreno o una combinación de ambas. 4 *Restatement of Torts 2d* Sec. 929(2) (1977); *Wilson v. Brand S Corp.*, 621 P.2d 748 (Wash. 1980). Si se trata de arbustos, árboles frutales, setos o pozos, resulta poco práctico cuantificarlos por separado, y el análisis debe limi-

tarse a otros modelos. *Restatement of Torts 2d*, supra, Comment f.

Un último método de cuantificación de daño ambiental considera la indemnización por daños morales que resulten directa o indirectamente del daño ecológico. *Nitram Chemicals, Inc. v. Parker*, 200 So.2d 220 (Fla. App. 1967); *Alonso v. Hills*, 214 P.2d 50 (Cal. App. 1950).

Cabe destacar que los mecanismos antes descritos no constituyen una lista exhaustiva. Pueden existir otros métodos razonables y científicamente adecuados para estimar daños ambientales cuando la completa restauración no sea posible. *Com. of Puerto Rico v. SS Zoe Colocotroni*, supra, pág. 676 esc. 24.

De lo anterior se desprende la miríada de métodos que se han identificado en la doctrina para valuar y mensurar el daño ambiental que ocasiona un menoscabo o una lesión a la propiedad de un reclamante. Dependerá de la naturaleza, la extensión y el carácter del daño o lesión sufrida para identificar el método más apropiado para medir el daño. En otras palabras, esa determinación se tomará caso a caso, y la prueba necesaria para establecer los daños dependerá de los hechos de cada caso. Lo que sí está claro en la normativa es que en un caso de esta naturaleza cabe una reclamación tanto por los daños especiales como por los morales.

Resolvemos, por lo tanto, que en una acción civil por daño ambiental al amparo del Art. 1802, *supra*, en la que se reclaman daños a la propiedad o a sus recursos naturales, el tribunal tiene a su disposición varios mecanismos para cuantificar el daño de manera que se logre una compensación adecuada. El objetivo principal deberá ser devolver la propiedad al estado existente antes del daño. Somos conscientes, sin embargo, que por lo general la restauración del área afectada resultará físicamente imposible o desproporcionadamente onerosa, en cuyo caso no es factible utilizar el mecanismo de la restauración.

Cuando ello ocurra, se deberá acudir a otros modelos de valuación de daños, como los previamente discutidos.

 Los tribunales tienen gran discreción para escoger el modelo que ha de utilizarse, determinación que dependerá en gran medida de la naturaleza del daño ambiental reclamado —*sea éste moral, patrimonial o una combinación de ambos*— y las características de la propiedad. Independientemente del modelo por adoptarse, la valoración del daño debe ser razonable, proporcionada al daño ambiental sufrido y a los valores ecológicos perjudicados. *Com. of Puerto Rico v. SS Zoe Colocotroni*, supra. Evidentemente, quien reclame el daño tiene que probarlo y, como hemos indicado en otro contexto, el estimado que haga el demandante del daño y la evidencia que presente a esos fines no requieren precisión matemática. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 321 (1990). Probados los elementos de la responsabilidad extracontractual, el hecho de que exista cierto nivel de especulación en la prueba no nos impide proveer al reclamante un remedio adecuado.

 Cuando el daño a resarcir sea moral, es menester que quien lo reclame especifique en qué consiste éste y cómo le ha afectado. Necesariamente entonces, el tribunal deberá sopesar, entre otros, los aspectos siguientes:

1. La personalidad del damnificado y su particular grado de sensibilidad, visto desde la perspectiva del interés afectado. Esto es extremadamente importante, pues los daños morales nacen de la lesión sufrida en el componente psíquico emocional del perjudicado.

2. Los intereses lesionados.

3. La naturaleza de la lesión sufrida.

4. El efecto del transcurso del tiempo sobre la lesión, bien como factor coadyuvante para agravar o mitigar el daño moral acaecido.

5. En casos apropiados, la divulgación pública que haya tenido el hecho dañoso.

6. Las circunstancias que rodearon el acto que causó el daño, incluyendo la intencionalidad del agente y los medios empleados para causar el daño. Pizarro, *op. cit.*, pág. 430; Carneiro, *op. cit.*, págs. 61–106.

■■■ Hay que señalar que el daño moral es, en esencia, la modificación en la subjetividad del damnificado derivada de la lesión a un interés no patrimonial, que se traduce en un modo de estar diferente y anímicamente perjudicial al que se tenía antes del hecho.

## V

Analicemos los hechos particulares del caso a la luz del derecho antes expuesto.

Según concluyó el Tribunal de Primera Instancia en sus determinaciones de hechos,

> [e]n el 1990 el Señor Díaz empezó a sacar material de la corteza terrestre en una de sus propiedades y tiró material a la propiedad del demandante causando que se tapara el Río Manatí, destrozó parte del bosque; afectó como tres cuerdas en el 90; afectó el farallón; se dañaron los caminos; destruyó parte de las facilidades del área recreativa, cayeron muchísimas piedras en la propiedad de Rivera, algunas aves no volvieron; se taparon las cuevas en el farallón; *es un desastre que no se puede calcular*; en el 1994 se afectaron como seis cuerdas. (Énfasis nuestro.)[23]

Por su parte, el Tribunal de Apelaciones reiteró que conforme a la sentencia y las determinaciones de hechos del tribunal de instancia, los daños alegados en la demanda fueron debidamente probados. Sin embargo, entendió el foro *a quo* que de la totalidad del expediente no surgía "algo que permita conceder alguno de los daños específicos reclamados".

Luego de estudiar detenidamente el expediente del caso, la evidencia presentada y la exposición narrativa de

---

[23] Véase Sentencia del Tribunal de Primera Instancia, Sala Superior de Arecibo, 31 de julio de 2003, Apéndice, pág. 410.

la prueba, coincidimos plenamente con el tribunal senten-
ciador *únicamente* en que los actos de los recurridos cons-
tituyeron un desastre incalculable a los recursos medioam-
bientales de la propiedad del señor Rivera. No
compartimos —ni comprendemos— la determinación de
los foros inferiores de no adjudicar los daños y desestimar
la demanda bajo el fundamento de ausencia de prueba que
los sustente. Dicha conclusión es claramente insostenible y
errónea.

No albergamos duda en nuestra mente, a base del expe-
diente de este caso, que los daños morales sufridos por la
parte demandante como resultado del daño ecológico que
las acciones negligentes del demandado causaron *en la
propiedad del señor Rivera,* quedaron plenamente
probados. Es incomprensible que ninguno de los dos foros
siquiera hubiese hecho referencia a éstos. Los daños mora-
les en este caso fueron probados. Sólo resta valuarlos, fun-
ción para la cual los tribunales están plenamente
capacitados. Recalcamos: el elemento de subjetividad es in-
manente a la propia naturaleza del daño moral; no por ello,
sin embargo, éste se torna imposible de cuantificar.

Por otro lado, y respecto a los daños especiales, debemos
consignar que lo cierto es que la prueba presentada no fue
la más idónea y descansó principalmente en el testimonio
del demandante. Además, el desglose de los daños en la
demanda tiene claros visos de "hipervaluación". Ahora
bien, el testimonio del demandante, creído como fue, ofrece
base suficiente para poder cuantificar, con cierto grado de
objetividad, el monto de *algunos* de los daños especiales
reclamados.[24] El Tribunal de Primera Instancia impuso la
onerosa carga al peticionario de probar la cuantía de sus
daños especiales con certeza matemática, criterio que ha
sido expresamente rechazado por esta Curia. Habida
cuenta que estamos ante daños ambientales que ocurrie-

---

[24] Conforme lo antes expresado, el Tribunal de Primera Instancia deberá ree-
valuar su determinación de no conceder una partida por el daño especial de pérdida
de ingreso, al igual que por los demás daños físicos sufridos en la propiedad del
demandante, según éstos surgen del informe pericial.

ron hace más de diez años, este es un caso claro en el que la reparación *in natura* no es una alternativa factible. Tampoco es viable computar el daño bajo el modelo de disminución en valor, ya que según el testimonio del peticionario, la propiedad ha experimentado un incremento en su valor en el mercado, que no refleja el valor de los recursos ecológicos. Estimamos que con la prueba que obra en el expediente puede razonablemente calcularse la cuantía del daño utilizando una combinación del valor de pérdida de uso y costo de reemplazo. Para este cómputo deben utilizarse como base los estimados brindados por el peticionario en su testimonio, así como la prueba pericial.

Por los fundamentos anteriormente expuestos, *se devuelve el caso al Tribunal de Primera Instancia para que proceda a determinar la compensación adecuada en proporción al daño sufrido, en conformidad con los principios expuestos en esta opinión. En la determinación final de la compensación que ha de concederse, el tribunal de instancia deberá considerar si el peticionario, al negarle acceso al demandado a su finca para que éste llevase a cabo los trabajos de restauración que fueron ordenados por el Departamento de Recursos Naturales, incurrió en negligencia comparada. De concluir en la afirmativa, el tribunal deberá proceder a reducir del monto total de la compensación el porcentaje correspondiente a su negligencia.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Fuster Berlingeri disintió con una opinión escrita. Los Jueces Asociados Señor Rebollo López y Señor Rivera Pérez no intervinieron.

— O —

Opinión disidente del Juez Asociado Señor Fuster Berlingeri.

En el caso de autos, tanto el foro de instancia como el foro apelativo se negaron a indemnizar al demandante por

los daños que sufrió, por la sencilla razón de que éste *no presentó evidencia alguna sobre el valor concreto de tales daños.* Dichos foros concluyeron que el demandante, en efecto, sufrió daños. Sus dictámenes, mediante los cuales se rehusaron a conceder alguna compensación al demandante no se basaron en que la propiedad del demandante no hubiese sido perjudicada por los actos negligentes del demandado. Se basaron más bien en el hecho de que *el demandante no aportó ninguna prueba que permitiese al tribunal valorizar los daños en cuestión.*

El siguiente pasaje de la sentencia del Tribunal de Apelaciones indica claramente el fundamento de su decisión en el caso de autos:

> [N]o encontramos en los autos algo que permita conceder alguno de los daños específicos reclamados, pues *aunque probada su existencia,* no se probó su valor.
>
> En efecto, en el expediente encontramos afirmaciones sobre el uso no autorizado de explosivos y remoción de terreno por parte de los apelados, así como del desprendimiento de terreno sobre la propiedad del apelante y la descripción de los cambios en el flora, fauna y geoestética del paisaje; los que se atribuyen como posible efecto de la perturbación ocasionada por los derrumbes. No obstante, no surge de la prueba, aun tampoco del informe del perito del apelante, elementos que nos permitan determinar el impacto causado a la propiedad o datos de clase alguna que nos permitan hacer un cómputo de la suma que debió recibir el apelante. Tampoco encontramos evidencia que sostenga la cuantía del importe reclamado en concepto de pérdida de ingresos, ya que no se aportó evidencia del beneficio económico percibido antes de los derrumbes; así como nada encontramos sobre los daños que se reclama sufrieron las estructuras existentes en la finca, *lo cual pudo haber sido suplido mediante tasaciones o estudios donde se valorizaran los daños específicos causados a la estructura o su depreciación.* En consideración a lo anterior, no podemos fijar el menoscabo causado a los ingresos o propiedades del apelante, ya que actuaríamos necesariamente sobre bases especulativas y arbitrarias si fijáramos una compensación sin evaluar esos elementos ....
>
> En el caso ante nuestra consideración, *el apelante no aportó prueba sobre el importe de los daños sufridos,* por lo que nos encontramos impedidos de variar la determinación del TPI de no conceder a éstos una cuantía monetaria en carácter indemnizatorio. (Énfasis suplido.) Apéndice, págs. 445–446.

Frente a esta situación de carencia evidenciaria, procedía *confirmar* los dictámenes *a quo*. Como se sabe, nuestro sistema de derecho es de carácter adversativo y de naturaleza rogada. Prevalece, en general, el principio elemental de que le toca al reclamante en un pleito el peso de la prueba con respecto a sus alegaciones. El demandante tiene la obligación de poner al juzgador en condiciones de determinar los daños y perjuicios que ha sufrido. *Matos v. Adm. Servs. Médicos de P.R.*, 118 D.P.R. 567 (1987); *Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644 (1985); *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 D.P.R. 527 (1981); *Vaquería Garrochales, Inc. v. A.P.P.R.*, 106 D.P.R. 799 (1978). Veáse, además, J.A. Cuevas Segarra, *La responsabilidad civil y el daño extracontractual en Puerto Rico*, San Juan, Pubs. JTS, 1993, Cap. VI, págs. 132–154.

Reiteradamente hemos reconocido la dificultad que presenta en ocasiones la tarea de aquilatar daños y, por ende, la latitud discrecional que tiene el juzgador de los hechos para realizar esa difícil tarea. *Pero en todo caso, dicha tarea se tiene que realizar sobre la base de la prueba sobre el particular aportada en el juicio.* Véanse: *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987); *Meléndez v. Lebrón Rodríguez*, 111 D.P.R. 45 (1981); *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757 (1978); *Moa v. E.L.A.*, 100 D.P.R. 573 (1972); *Concepción Guzmán v. A.F.F.*, 92 D.P.R. 488 (1965); *Baralt v. Báez*, 78 D.P.R. 123 (1955). *Si no se presenta prueba alguna sobre uno de los elementos de la acción, como sucedió aquí con respecto al valor de los daños sufridos, no procede la reclamación.*

La mayoría en su opinión, en lugar de reiterar esta conocida normativa, opta por otro curso de acción. En lugar de confirmar la correcta decisión de los foros *a quo*, se dedica más bien a crear una *controvertible*[1] acción *privada*

---

[1] En vista de que la Sec. 19 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1999, pág. 421, dispone que será política pública en el país el aprovechamiento de los recursos naturales *"para el beneficio general de la comunidad"* (énfasis suplido), cabe preguntarse si procede en Puerto Rico una acción torticera para beneficio de una persona particular por daños a recursos naturales. ¿Dónde queda entonces la

por daños a recursos medioambientales al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, y a proclamar aún más *controversialmente*(²) que se trata de una acción para resarcir *un daño moral* sufrido por el dueño de la finca deteriorada, que consiste, en esencia, en

> ... la modificación en la subjetividad del damnificado derivada de la lesión a un interés no patrimonial, que se traduce en un modo de estar diferente y anímicamente perjudicial al que se tenía antes del hecho. Opinión mayoritaria, pág. 438.

La mayoría del Tribunal entiende que con tales pautas el foro de instancia puede calcular la cuantía del daño sufrido por el demandante. En efecto, la mayoría instruye al foro de instancia a utilizar para ello una combinación del método de valor de pérdida de uso y del método de costo de reemplazo. Se ordena la utilización de tales medios para calcular el monto de los daños en el caso de autos, a pesar de que estos métodos *no corresponden de modo alguno* al singular daño moral que se ha de resarcir.

---

reparación del interés público? Véase *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974). La mayoría del Tribunal no examina esta esencial cuestión.

Tampoco examina la cuestión correlativa de si tal acción *privada* procede independientemente del recurso natural en cuestión. Así pues, ¿procede tal acción *privada* cuando la pérdida no es de un recurso *"escénico"*, como el que resalta la mayoría aquí, sino de otros recursos naturales de mayor valor propiamente ecológico que trascienden una finca en particular, como cuando se trata del hábitat de determinada fauna o flora que se extiende por una región que abarca numerosas fincas particulares, o de un manantial que nace y fluye por varios lugares? ¿Qué sucede cuando se trata de un recurso natural que sólo tiene una presencia pasajera en la finca privada, como aves migratorias o tortugas que vienen a anidar allí?

(²) A parte del hecho de que el uso por la mayoría aquí de la figura del "daño moral" *no tiene precedente alguno en nuestra jurisprudencia* —si acaso lo contrario— cabe preguntarse si ese "daño moral" es genérico que sufrimos todas las personas en el país cuando se afecta un recurso natural que es parte de nuestro patrimonio común, o si se trata —como parece creer la mayoría— de un daño que sufrió sólo el demandante. En tal caso, *¿qué prueba existía aquí de que éste en efecto experimentó subjetivamente tal daño*, más allá del pesar natural que siente cualquiera por el menoscabo de una propiedad valiosa, que reiteradamente hemos resuelto que no es indemnizable? *Soegard v. Concretera Nacional, Inc.*, 88 D.P.R. 179 (1963); *Díaz v. Palmer*, 62 D.P.R. 111 (1943); *Díaz v. Cancel*, 61 D.P.R. 888 (1943). ¿Cómo sabemos que el reclamante aquí tenía una sensibilidad ambiental especial como para sufrir un daño moral particular por el menoscabo de un recurso natural?

Por otro lado, no queda claro tampoco porqué un daño ambiental, que por su naturaleza propia es de ordinario y medularmente un *daño material*, deba resarcirse *primordialmente* como un *daño moral*.

Yo, por mi parte, estimo que en el caso de autos no se presentó prueba que le permita al tribunal *a quo* llevar a cabo una evaluación razonable de los daños probados. Los equívocos pronunciamientos de la mayoría del Tribunal en su opinión hacen aún más difícil realizar tal evaluación.

Tampoco entiendo porqué la mayoría, si desea darle una inusitada segunda ocasión al demandante para presentar ahora su prueba sobre el valor de los daños sufridos, no lo hace pautando precisamente el tipo y los medios de prueba que serían procedentes para lograr la cotización debida de los singulares daños presentes en este caso.

En lugar de seguir algunos de los cursos decisorios referidos, la mayoría del Tribunal opta por *idear* una nueva causa de acción en nuestro derecho sobre la responsabilidad extracontractual, *sin ofrecer a la vez una justificación suficiente para ello ni presentar una conceptualización clara y coherente de tal causa de acción.* Este proceder es particularmente sorprendente en vista de que la mayoría del Tribunal reconoce en su propia opinión que en otras jurisdicciones, daños como los que aquí nos conciernen, se dilucidan mediante reclamaciones basadas en el derecho de propiedad. Esa realidad ha debido servir de precaución a la mayoría en cuanto a aventurarse a abrir brechas rudimentarias en casos como el de autos.

Es por todo lo anterior que no estoy conforme con la opinión mayoritaria y, por ello, disiento.