# 2009 DTA 88

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**
**PANEL V**

HÉCTOR A. RUSSÉ RIVAS, MARÍA DE LOS ÁNGELES RAMOS MARRERO, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS Y EN REPRESENTACIÓN DE SU HIJA MENOR ANDREA RUSSÉ RAMOS
Demandantes-Apelantes

v.

DR. JOSÉ E. PÉREZ GUMÁ, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR ÉL Y SU ESPOSA JANE DOW; SIMED
Demandados-Apelados

HOSPITAL SAN PABLO DE BAYAMÓN; COMPAÑÍAS ASEGURADORAS A, B Y C; FULANO DE TAL; ENTIDAD JURÍDICA
Demandados

Núm. KLAN-2008-01110

San Juan, Puerto Rico, a 10 de junio de 2009

Panel integrado por su Presidente, el Juez Arbona Lago, el Juez Salas Soler y la Juez Cotto Vives

Cotto Vives, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El señor Héctor Russé Rivas, la señora María de los Ángeles Ramos Marrero, por sí y en representación de la sociedad legal de bienes gananciales por ellos compuesta, así como en representación de su hija menor Andrea Russé Ramos, comparecieron ante este Tribunal peticionando que revoquemos la sentencia emitida, el 9 de junio de 2008, por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Mediante dicho dictamen, fue desestimada la demanda que presentaron contra el Hospital San Pablo, entre otros. La razón para ello fue la alegada ausencia de prueba en cuanto a que los daños sufridos se debieron con mayor probabilidad a la negligencia imputada al Dr. José E. Pérez Gumá. Además, les impuso a los demandantes-apelantes el pago de $2,000 en concepto de honorarios de abogado.

Contando con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

### I

Repasemos los hechos, según surgen del récord ante nos. El 30 de marzo de 2005, los demandantes presentaron una demanda sobre daños y perjuicios contra el Dr. Pérez Gumá, la sociedad legal de bienes gananciales constituida por él y su esposa, SIMED, el Hospital San Pablo de Bayamón y contra varias compañías aseguradoras. Los hechos y alegaciones allí expuestas fueron los siguientes:

"3. Que Andrea Russé Ramos nació el pasado 19 de junio de 2003 a las 12:40 de la tarde en el Hospital San Pablo de Bayamón.

4. Que durante todo el tiempo de gestación de la menor, la madre de ésta, María Ramos, fue atendida por el Dr. José E. Pérez Gumá.

5. Que el alumbramiento de la menor estuvo a cargo del Dr. José E. Pérez Gumá y el personal del Hospital San Pablo de Bayamón.

6. Que durante el proceso de alumbramiento de la menor, tanto el Dr. José E. Pérez Gumá como el personal del Hospital San Pablo de Bayamón, se desviaron del patrón de cuidado obstétrico recomendado, incurrieron en mala práctica médica, en los siguientes aspectos:

a. No se evaluó una condición de oligohidramnios.

b. No se identificó la presentación de nalgas "breech" al entrar en pródromo de parto.

c. Una vez se identifica el "breech", no se evaluó qué tipo de "breech" era.

d. No hay evidencia de que se le explicara a los padres los riesgos de oligohidramnios ni del parto de nalgas.

e. No existe descripción del parto para identificar la extracción parcial.

f. No se hace intervención alguna para evitar el parto de muy alto riesgo contrario a las especificaciones de "American Collage of Obstetricians and Gynecologists".

g. El personal de enfermería de los codemandados Hospital San Pablo, capaz de identificar tanto la taquicardia fetal como la exagerada frecuencia de las contracciones uterinas, falló en así hacerlo.

h. Los codemandados no practicaron una cesárea de emergencia para no exponer a un feto de alto riesgo a aún más riesgo de morbilidad, a pesar de haber tenido amplia oportunidad para sí hacerlo.

7. Que la mala práctica médica incurrida por los codemandados Dr. José E. Pérez Gumá y el personal de enfermería del Hospital San Pablo de Bayamón, según antes descrita, es la única y directa consecuencia de los daños físicos sufridos por la menor al momento del alumbramiento.

8. Que los daños físicos de la menor consisten en deformaciones consecuentes con el oligohidramnios prolongado y el parto de nalgas, específicamente una masa en el cuello, la cual se encuentra lateral al músculo esternocleidomastoideo izquierdo e inferior y separada de la glándula submandibular.

9. Que la condición de la menor antes descrita es compatible con un trauma y desgarramiento del músculo esternocleidomastoideo que ocurrió durante el parto de nalgas desarrollándose en hematoma y que luego al cicatrizar resulta en un acortamiento del músculo, lo que a su vez provoca que a medida que el cuello se alarga, la cabeza se va virando, produciendo tortícolis.

10. Que la evidencia médica revela una ausencia de intervenciones preventivas por parte de los codemandados Dr. José E. Pérez Gumá y Hospital San Pablo, las cuales contribuyeron significativamente a las deformaciones de la bebé.

11. Que desde la fecha de su alumbramiento hasta el presente, la menor ha tenido que ser sometida a diversos tratamientos médicos para su condición, incluyendo terapias físicas y de rehabilitación, y próximamente será sometida a una cirugía en los Estados Unidos con el propósito de colocarle un artefacto externo en su cabecita y cuello para intentar corregir las deformaciones ocurridas durante el alumbramiento.

12. Que la menor quedará con un por ciento de impedimento permanente en las actividades de su diario vivir, cuyo por ciento será determinado oportunamente.

13. Que la condición de la menor será una permanente lo cual requerirá de tratamientos médicos y atenciones especiales por el resto de su vida.

14. Que los daños físicos, dolores y sufrimientos, impedimento futuro permanente, gastos médicos pasados, presentes y futuros y la merma en la capacidad para generar ingresos futuros de la menor Andrea Russé Ramos ocasionados directamente por las actuaciones negligentes de los codemandados Dr. José Pérez Gumá así como del Hospital San Pablo, se han valorado en la suma de $8,000,000.00.

15. Que los padres de la menor y también codemandantes Héctor Russé y María Ramos, han sufrido pérdida de ingresos e intensas angustias mentales al ver a su pequeña hija sufrir las consecuencias de los actos negligentes de los Hospitales San Pablo, las cuales se han valorado en la suma de $2,000,000.00.

16. Que los codemandados José E. Pérez Gumá así como el Hospital San Pablo, son solidariamente responsables a los demandantes por todos los daños reclamados en esta demanda.

...

...".

El Dr. Pérez Gumá y SIMED contestaron la demanda presentada en su contra. Éstos negaron las alegaciones medulares y presentaron varias defensas afirmativas. La codemandada UHS of PR Inc. h\n\c Hospital San Pablo también presentaron alegación responsiva. En síntesis, todos los demandados negaron la existencia de negligencia y de nexo causal entre los daños y los alegados actos negligentes.

No obstante, el 29 de abril de 2008, los demandantes y el Hospital San Pablo, presentaron ante el TPI una estipulación transaccional sujeta a autorización judicial.

Culminado el descubrimiento de prueba, el TPI celebró vista en su fondo, la cual tuvo lugar el 13 de mayo de 2008. Las partes presentaron tanto prueba testifical y pericial, como documental. Una vez aquilatada, el TPI dictó sentencia, en la que desestimó la demanda presentada. El fundamento, para así proceder, descansó en que los demandantes no probaron que los daños sufridos se debieron con mayor probabilidad a la negligencia imputada. Entre las determinaciones más relevantes y que nos ayudan a la adjudicación de la causa de epígrafe se encuentran las siguientes:

"4. La demandante María de los Ángeles Ramos Marrero confía al aquí codemandado Dr. José E. Pérez Gumá, médico obstetra-ginecólogo, para que atienda su segundo embarazo y parto a partir del 10 de diciembre de 2002. Dicho médico fue el obstetra-ginecólogo que atendió a la paciente y aquí demandante, durante todo su embarazo y su parto, objeto de la presente demanda.

5. ... Aproximadamente a las 30 semanas se ordena un segundo sonograma para seguimiento de su embarazo. Éste se hizo el 13 de mayo de 2003 indicando que el líquido amniótico en su vientre se encontraba disminuido, con un AFI de 7.2.

6. Un tercer sonograma obstétrico fue llevado a cabo el 11 de junio de 2003, el cual indicó que el AFI se encontraba en 6.66.

7. A partir del segundo sonograma, el cual indicó una baja en el líquido amniótico del bebé, según el récord

médico de la oficina de Dr. Pérez Gumá, ésta fue seguida semanalmente en sus visitas prenatales, entre el 11 de mayo y el 16 de junio de 2003, lo que da un promedio de dos visitas por semana. En todas estas visitas se le practicaron pruebas de bienestar fetal a base de un monitoreo fetal electrónico conocido como NST por sus siglas en inglés (non-stress test), las cuales demostraron siempre evidencia de bienestar fetal.

8. Según el testimonio de la propia demandante, cuando se obtiene el resultado del segundo sonograma obstétrico le fue informado por su médico el doctor Pérez Gumá, que tenía menos líquido amniótico. Éste le recomendó que tomara mucho líquido, se le orientó para que descansara y de ahí en adelante comenzó a verla más frecuentemente en su oficina. Además, según el testimonio de la propia demandante, en su última visita a la oficina del médico, ésta aceptó que dicho galeno la había evaluado vaginalmente y le había informado que el bebé se encontraba de cabeza.

9. El día 19 de junio del 2003, la paciente es admitida al Hospital San Pablo a las 35 semanas y 5/7 de gestación por contracciones y se aprovecha para acelerar su parto. Inicialmente se determina por el doctor Pérez Gumá vía evaluación vaginal que el feto está en posición de cabeza (vertex), lo que así se desprende del propio récord médico del hospital. Después de romper fuente y encontrarse el cuello uterino completamente dilatado, se determinó por el médico que el bebé en ese momento estaba en presentación de nalgas ("breech"). Cuando la paciente rompe fuente a las 12:00 del mediodía, se encuentra el líquido amniótico claro y limpio, lo que es indicativo de que no existe angustia respiratoria. Al bebé adicionalmente en ese momento se le realizaba personalmente por el doctor Pérez Gumá un sonograma para determinar la posición exacta del bebé previo al nacimiento. Dicho galeno evalúa a la paciente y utilizando su criterio médico determina que debido a lo avanzado del proceso de parto el mismo debe proceder por vía vaginal. La paciente da a luz una bebé de 5 libras y 2 onzas vía la maniobra de Morrisseau Smiley Veit.

10. Al momento de su nacimiento se le otorga una puntuación de APGAR por neonatólogo de 7 al minuto y 8 a los cinco minutos, lo que es indicativo de un recién nacido en buen estado neonatal.

11. Según se desprende del récord médico, el nacimiento de la bebé transcurrió sin complicaciones, naciendo por el método de extracción parcial, asistiendo el médico al nacimiento por los hombros y la cabeza por la maniobra Morrisseau Smiley Veit. Fue un parto normal de nalgas con un buen APGAR.

12. La bebé es admitida a NICU (Neonatal Intesive Care Unit), por problemas respiratorios y se le notaron lo que aparentaba ser malformaciones congénitas. Es dada de alta a los diez días por el Servicio de Neonatología, el 25 de junio de 2003.

13. La niña Andréa Russé Ramos al día de hoy, padece de una condición conocida como hipotonia, tono disminuido del músculo esqueletal, y de una condición conocida como Escoliosis, desviación de la columna vertebral. Por esta última condición ha sido operada en dos ocasiones y ha recibido tratamiento médico por el Grupo Shrinners y el hospital Connecticut Children's Medical Center.

14. Según se desprende de la prueba tanto testifical, documental y pericial que desfiló ante el Tribunal en el presente caso, ambas condiciones no tienen ninguna relación con la condición de oligohydramnios desarrollada por la madre de la niña en su etapa antes del parto, ni tampoco con el parto de nalgas ("breech") que tuvo la niña."

Inconforme con la decisión de instancia, los demandantes-apelantes recurrieron ante nos. Adujeron que el TPI erró al determinar que el Dr. Pérez Gumá no se apartó del estándar de cuidado generalmente establecido y aceptado por los médicos obstetras-ginecólogos en casos de embarazos "breech", como el de autos, y al concluir que los daños sufridos por la menor no fueron producto de dicha desviación. Además, alegaron que el TPI incidió al celebrar el juicio en un sólo día, ya que esto le afectó la presentación de prueba y su derecho a contrainterrogar.

Los demandados-apelados, a pesar de que no presentaron alegato en oposición, sí sometieron un alegato suplementario donde señalaron aquellas partes de los testimonios que sustentaban la conclusión del TPI. Con estos antecedentes, procedemos a resolver.

## II

Como se sabe, es norma reiterada que "las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". Regla 43.2 de Procedimiento Civil, 32 L. P.R.A. Ap. III, R. 43.2.

En vista de ello, en casos donde existe conflicto en la prueba, corresponde precisamente al tribunal de instancia dirimirlo. *Flores v. Soc. de Gananciales,* 146 D.P.R. 45, 50 (1998). Asimismo, en casos donde exista controversia respecto a elementos subjetivos, el juzgador de los hechos estará en mejor posición para apreciar la prueba testifical, puesto que ha tenido el gran beneficio de escuchar y observar el *demeanor* de los testigos. *Argüello v. Argüello,* 155 D.P.R. 62, 78-79 (2001); *Hernández v. San Lorenzo Const.,* 153 D.P.R. 405 (2001).

Encontrándose el foro de primera instancia en mejor posición que este tribunal apelativo intermedio para aquilatar toda la prueba desfilada, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, debemos abstenernos de intervenir con las determinaciones de hechos formuladas por el juzgador de instancia. *Ramos v. Wal-Mart,* 168 D.P.R. ___ (2006), **2006 J.T.S. 106**; *Colón v. Glamorous Nails,* 167 D.P.R. 33, 59 (2006).

Como vemos, reiteradamente la regla general concede gran deferencia a la apreciación que de la prueba efectúe el TPI, *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985); *García v. A.F.F.,* 103 D.P.R. 356, 357-358 (1975), ya que en apelación sólo contamos con récords poco expresivos. *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721, 728 (1984). El "testimonio debe ser oído y visto, interrogado y mirado". *Hawayek v. A.F.F.,* 123 D.P.R. 526, 531 (1989).

No obstante, esto no implica que los tribunales sentenciadores sean inmunes a cometer errores, ni que sus determinaciones de hechos sean inmutables. Es decir, los tribunales apelativos, por vía de excepción, pueden descartar dichas determinaciones cuando éstas sean inherentemente imposibles o increíbles. *Pueblo v. Acevedo Estrada,* 150 D.P.R. 84, 98-99 (2000); *Pueblo v. Rivero, Lugo y Almodóvar,* 121 D.P.R. 454, 471-475 (1988); *Pueblo v. De Jesús Rivera,* 113 D.P.R. 817, 826 (1983).

Por otro lado, como es sabido, en casos de impericia médica que están fundamentados en la prueba pericial y documental, los tribunales apelativos se encuentran en la misma posición que el foro de instancia para evaluarlas y hacer sus propias conclusiones. *Ramos, Escobales v. García, González,* 134 D.P.R. 969, 976 (1993).

De un análisis al expediente y de la exposición narrativa de la prueba, concluimos que el TPI, en efecto, cometió error manifiesto en su apreciación. Presente uno de los parámetros revisores, procedemos a intervenir y a remplazar la evaluación que de la prueba testifical realizó el foro apelado.

## III

Los cimientos de toda reclamación de daños y perjuicios se encarnan en el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141. Esta fundamental norma de derecho precisa lo siguiente:

"El que por acción u omisión causa daño a otro interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de una indemnización."

Como se sabe, para que prospere una causa de acción en daños y perjuicios se necesita que concurran tres

elementos: (1) que se haya sufrido un daño; (2) un acto u omisión culposo o negligente; y (3) nexo causal entre el daño y la acción u omisión culposa o negligente. *Blás v. Hosp. Guadalupe,* 146 D.P.R. 267, 322 (1998); *Sepúlveda de Arrieta v. Barreto,* 137 D.P.R. 735, 753 (1994), *Bonilla v. Chardón*, 118 D.P.R. 599, 610 (1987).

La responsabilidad civil por impericia médica también se rige por el Art. 1802, *supra*, teniéndose así que demostrar los tres elementos antes mencionados.

Ya indicamos que uno de los elementos de esta causa de acción lo es la existencia de un acto u omisión culposo o negligente. El factor negligencia se ha definido como:

"...el quebrantamiento del deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución que las circunstancias del caso exijan, para no exponer a riesgos previsibles e irrazonables de daños como consecuencia de la conducta del actor, a aquellas personas que, por no estar ubicadas muy remotas de éste, un hombre prudente y razonable hubiese previsto, dentro de las circunstancias del caso, que quedaban expuestas al riesgo irrazonable creado por el actor." *López v. Dr. Cañizares*, 163 D.P.R. 119, 132 (2004).

No obstante, se ha resuelto que el deber de anticipar y evitar la ocurrencia de un daño —cuya probabilidad es razonablemente previsible—, no se extiende a todo riesgo posible o inimaginable. Lo fundamental es prever de forma general las consecuencias de la acción o inacción que se pretende ejecutar. *Id.* a la pág. 133; *Blás v. Hosp. Guadalupe, supra,* a la pág. 324.

Es norma reiterada que los médicos, en el desempeño de sus funciones profesionales, tienen la responsabilidad de brindar a sus pacientes aquella atención que, *a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica. López v. Dr. Cañizares, supra,* a la pág. 133; *Santiago Otero v. Méndez,* 135 D.P.R. 540, 549 (1994).

Como se sabe, la carga probatoria, en materia de daños y perjuicios por mala práctica profesional, recae en la parte demandante. Esto se debe a que a los médicos les cobija la presunción de que han ejercido un grado razonable de cuidado y que el tratamiento brindado fue el adecuado. Ante esta situación, es al demandante al que le corresponde derrotar dicha presunción mediante preponderancia de la prueba. En otras palabras, éste tiene que demostrar que el tratamiento médico ofrecido, o la ausencia de proveer el indicado y correcto, fue el factor que con mayor probabilidad causó los daños alegados. Enfatizamos que para rebatir la presunción de corrección, el demandante no podrá descansar en una mera posibilidad de que el daño se debió al incumplimiento del médico con su obligación profesional. La relación de causalidad no se puede establecer a base de una mera especulación o conjetura. *López v. Dr. Cañizares, supra,* a las págs. 134-135; *Santiago Otero v. Méndez, supra,* a la pág. 549.

Hay que tener presente que la negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. *López v. Dr. Cañizares, supra; Rodríguez Crespo v. Hernández,* 121 D.P.R. 639, 650 (1988).

Se ha establecido que para establecer un caso *prima facie* de impericia médica se tiene que presentar prueba sobre: (1) la normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la relación causal entre la actuación u omisión del facultativo y la lesión sufrida por el paciente. *Rodríguez Crespo v. Hernández, supra,* a la pág. 650.

Conforme a la norma antes transcrita, el médico solamente responde por los daños y perjuicios causados cuando actúa negligentemente, con descuido o cuando falta a la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark,* 119 D.P.R. 816, 820 (1987); *López v. Dr. Cañizares, supra,* a la pág. 134.

En relación al criterio de daños, la jurisprudencia ha determinado que daño es todo aquel menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, ya sea en su propiedad o en su patrimonio. *Soto Cabral v. E.L.A.,* 138 D.P.R. 298, 310 (1995).

Bajo el palio del Art. 1802, *supra,* se reconocen dos tipos de daños: los patrimoniales (conocidos también como daños especiales, pecuniarios o económicos) y los daños morales. Estos últimos son aquellos infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado. *Rivera v. S.L. G. Díaz,* 165 D.P.R. 408, 428 (2005). Por tanto, los daños morales están compuestos por las angustias físicas y mentales, así como la pérdida de compañía, afecto y la incapacidad. *Cintrón Adorno v. Gómez,* 147 D.P.R. 576, 587 (1999).

En una reclamación de daños, resulta imperativo que la parte demandante demuestre la existencia de un daño y en qué cantidad se estima. Para esto, el demandante debe poner al juzgador en condición de determinar, sin que se tenga que recurrir a especulaciones, los daños y perjuicios realmente sufridos por él. *Rodríguez v. Serra,* 90 D. P.R. 776, 779 (1964). Es de recordar que nuestro estado de derecho sólo permite resarcir los daños que constituyen una consecuencia del hecho que obliga a la indemnización. *Estremera v. Inmobiliaria Rac, Inc.,* 109 D.P.R. 852 (1980). La razón de dicha norma descansa en el hecho de que como los daños reales constituyen un elemento esencial para que proceda la reclamación de daños y perjuicios, su inexistencia impedirá que éstos sean resarcidos a pesar de que exista un acto negligente.

Como se sabe, *el acto negligente, por sí sólo, no le confiere al demandante una causa de pedir; "la reparación del daño" existe únicamente como medida del daño sufrido y no del grado de descuido o negligencia del demandado. Soto Cabral v. E.L.A., supra,* a la pág. 309; *Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443 (1985).

Cónsono con la norma antes expuesta, cuando el demandante solicita el resarcimiento de daños patrimoniales, éste tiene que proveerle al juzgador todos los datos o detalles de las partidas afectadas y reclamadas para así poder cuantificar el daño y fijar la indemnización que corresponda. *Rivera v. S.L.G. Díaz, supra,* a las págs. 430-431.

Por otro lado, cuando lo que se reclama es indemnización por daños morales, el reclamante tiene que probar angustias y sufrimientos mentales profundos y no una mera pena pasajera. Consecuentemente, el demandante debe proveer evidencia que sustente que realmente quedó afectado en su salud, bienestar y felicidad. *Rivera v. S. L.G. Díaz, supra,* a la pág. 432.

En cuanto al tercer y último elemento constitutivo de una causa de acción bajo el Art. 1802, *supra,* (nexo causal), el Tribunal Supremo ha expresado en varias ocasiones que en Puerto Rico rige la doctrina de la causalidad adecuada, para determinar si existe algún tipo de relación entre el daño causado y el alegado acto culposo o negligente. De acuerdo con esta doctrina, se considera causa aquella condición que ordinariamente produciría el daño según la experiencia general. En otras palabras, cuando ese daño aparece como consecuencia razonable y ordinaria del acto. *López v. Porrata Doria,* res. el 4 de octubre de 2006, 169 D.P.R. ___ (2006), **2006 J.T.S. 158**; *Sepúlveda de Arrieta v. Barreto, supra,* a la pág. 759. Esta relación causal *es imprescindible en una reclamación en daños y perjuicios debido a que es el elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico. Rivera v. S.L.G. Díaz, supra,* a la pág. 422.

Conforme con lo anterior, existe causa adecuada cuando, de haberse realizado el acto omitido, se hubiese evitado el daño. *Ramírez v. E.L.A.,* 140 D.P.R. 385 (1996); *Soc. Gananciales v. G. Padín Co. Inc.,* 117 D.P.R. 94 (1986). Cuando el juzgador pasa juicio respecto a si una acción u omisión es causa próxima, adecuada o eficiente de un daño, es preciso que dicho foro efectúe un análisis del acto negligente, para auscultar si éste constituye la consecuencia razonable y ordinaria del daño o pérdida reclamada. *Montalvo v. Cruz,* 144 D.P.R. 748 (1998).

Enfatizamos que *el mero hecho de que acontezca un accidente no da lugar a inferencia alguna de*

*negligencia*. La letra del Art. 1802 del Código Civil, *supra*, ni la jurisprudencia interpretativa permiten tal conclusión. Por ello, reiteramos que para que prospere dicha acción, es preciso que el demandante demuestre —mediante preponderancia de prueba—, la realidad del *daño* sufrido, la existencia del acto u omisión *negligente* y el elemento de *causalidad. Admor. F.S.E. v. Almacén Ramón Rosa,* 151 D.P.R. 711, 724-725 (2000).

Antes de adentrarnos a la discusión sobre la existencia o no de negligencia durante el embarazo y el parto, así como en el nexo causal, debemos aclarar que no dispondremos del segundo error señalado. La conclusión arribada se debe a que al examinar la transcripción de la vista en su fondo nos percatamos que los demandantes-apelantes no plantearon esta situación ante el TPI.

La norma general en estos escenarios precisa que la función de los tribunales apelativos se ciñe a revisar asuntos que hayan sido planteados o resueltos por el TPI. En otras palabras, no resolveremos cuestiones que no fueron debidamente argumentadas en el foro correspondiente. *Autoridad sobre Hogares v. Sagastivelza,* 71 D.P.R. 436, 439 (1950); *Piovanetti v. Vivaldi,* 80 D.P.R. 108, 121-122 (1957); *Trabal Morales v. Ruiz Rodríguez,* 125 D.P.R. 340, 351 (1990).

De otra parte —de un minucioso y exhaustivo análisis tanto del expediente como de la transcripción del juicio en su fondo—, advertimos que el TPI erró al determinar que no existía negligencia por parte del Dr. Pérez Gumá y que no existía nexo causal entre los actos negligentes y ciertos daños sufridos por la menor y sus padres.

Veamos las controversias que nos corresponden atender:

"1) Si el Dr. Pérez Gumá fue negligente en el tratamiento prenatal y en el parto. Tienen la razón en cuanto a su proceder al momento del parto, no así en tratamiento prenatal.

2) Si las condiciones de hipotonia y escoliosis fueron causados por los actos negligentes del Dr. Pérez Gumá. No le asiste la razón en esta premisa, ya que el expediente está huérfano de evidencia que demuestre la existencia de nexo causal alguno."

Aclaramos que la ausencia del elemento de nexo causal entre la hipotonia y escoliosis no implica la inexistencia de otros daños producidos como consecuencia del acto negligente del doctor. Procedemos a explicar las conclusiones anteriormente arribadas.

En primera instancia, es menester señalar que —en el caso de autos—, existen varios hechos incontrovertibles que arrojan luz a la solución de la causa de epígrafe:

"1) que el Dr. Pérez Gumá fue el que asistió tanto el embarazo como el parto de la señora Ramos Marrero;

2) que los dos sonogramas anteriores al parto mostraban que el bebé se encontraba de nalgas ("breech") y que tenía oligohidramnios (una disminución del líquido amniótico, cuyo "amniotic fluid index" (AFI) ascendía a 7.2 para el 13 de mayo de 2003 y para el 11 de junio de 2003 mostraba un AFI de 6.6). Para esta última condición, el médico le recomendó que tomara mucho líquido y descanso. Además, éste comenzó a evaluarla más frecuentemente y le realizaba pruebas de bienestar fetal a base de un monitoreo fetal electrónico conocido como NST (non-stress test);

3) que al momento del parto, la bebé también se encontraba de nalgas ("breech") y que aún así, el Dr. Pérez Gumá realizó un parto "breech" por la ruta vaginal;

4) el Dr. Pérez Gumá ordenó que se le aplicara, a la señora Ramos Marrero, un medicamento conocido como Prostin Gel, el cual se utiliza para estimular contracciones y así poder inducir y provocarle el parto;

5) que la menor reflejó o se le identificaron los siguientes daños y condiciones:

Durante el parto: una vez el galeno le aplicó el Prostin gel, la señora Ramos Marrero experimentó contracciones uterinas titánicas; se desarrollo hiperestimulación, que quiere decir que la matriz se está contrayendo sin parar; y el feto desarrolló taquicardia con poca variabilidad, que es un signo de malestar fetal y de falta de oxígeno en el feto.

Inmediatamente luego del parto se percibió equimosis en los glúteos de la bebé; laceración en los muslos y en la vulva de la bebé. Además, la niña nació con hipotonia (que la bebé está monguita); se le identificó la condición de *pectus excavatum*. También presentó problemas respiratorios, una de las razones por la cual la bebé fue trasladada al NICU por 10 días.

Al tercer día del parto se identificaron otros problemas: una curvatura o desviación en el tórax de la bebé; se sospechó una dislocación de la cadera y una desviación ulnar de la mano izquierda en la bebé.

Para agosto del año 2003 se percibió que la bebé tenía un hematoma del esternocleidomastoideo y como consecuencia del hematoma la niña desarrolló tortícolis.

Para marzo de 2004 la niña también desarrolló escoliosis.

6) al día de hoy la menor padece de hipotonia, tono dismnuido del músculo esqueletal y de escoliosis."

Como indicamos, no albergamos duda alguna de que el Dr. Pérez Gumá fue negligente al realizar el parto de nalgas "breech". Nuestra decisión tiene como base el testimonio de la Dra. Carmen M. Ortiz Roque —perito de la parte demandante-apelante— al cual le damos entera credibilidad en cuanto a este respecto.

En este caso, la perito de la parte demandante-apelante denotó el estándar médico a la fecha en que ocurrieron los hechos del caso de autos (año 2003). En específico, informó la forma en que un obstetra-ginecólogo debe atender un alumbramiento de un feto que viene de nalgas y sobre el cuidado prenatal cuando se encuentra presente la condición de oligohidramnios. En relación a la primera condición, ella explicó lo siguiente:

**"Examen Directo de la Dra. Carmen M. Ortiz Roque** (págs. 20-26, 29, 31-34 de la Transcripción del Juicio en su Fondo)

*Lcdo. Ramírez Lugo*

*P  Doctora, con relación a la condición que usted ha descrito, parto de nalgas, le pregunto ¿cuál es el estándar médico en esa situación que usted describe de parto de nalgas?*

*R  Bien. El estándar se define para el momento donde ocurre el caso. Este caso... este nacimiento de esta bebé, este prenatal, ocurre en el 2003. Bien. El estándar para nacimientos de partos en el 2003 lo determinó el Colegio Americano de Obstetras-Ginecólogos en el año 2001, en su publicación titulada "Mode of Singleton Breech... Term Breech Delivery", que está en evidencia. Esa publicación es sumamente...*

...

...

...

P   Explique –si puede– sucintamente, cuál es el estándar médico.

*Honorable Juez*

Al 2003, que dice usted que allí se considera.

R   2003, sí, en el 2003 está vigente la recomendación del 2001. (1) Planificar un parto de nalgas por ruta vaginal no es apropiado. (2) Pacientes, bebés que presenten de nalgas persistentemente se les debe ofrecer una cesárea planificada. Y (3) si la paciente rehúsa, después que se le han explicado todos los riesgos aumentados del parto vaginal; si la paciente aún así rehúsa una cesárea, se debe tomar este consentimiento rehusando la cesárea y documentarlo en el expediente.

...

...

...

*Lcdo. Ramírez Lugo*

P   Le pregunto entonces: ¿Ese estándar que usted acaba de describir en este caso se siguió?

R   No se siguió.

P   No se siguió. ¿Por qué no se siguió, doctora?

R   Ese estándar no se siguió porque tenemos que el bebé en cuestión se indujo, se planificó un parto vaginal. El bebé no tenía...

...

...

P   A eso iba, doctora. En cuanto a ese plan que usted ha hecho referencia, ¿cómo usted sabe que ese parto de nalgas por la ruta vaginal se planificó por el Dr. Pérez?

R   Hoja de Admisión.

...

...

R   Siguiendo las órdenes médicas. 5:45 de la mañana la orden dice: "Se prepare mini-prep y enema; o sea, que se afeite la vulva...

...

P   ¿Y ese procedimiento que usted acaba de describir, se hace para qué tipo de parto?

R   Parto vaginal.

P   Muy bien.

R   No se hace para cesárea.

...

...

R   Escribe la enfermera: "Paciente refiere decir venir para inducción de parto".

...

...

R   Página 38, les decía: "Se prepara para inducción de parto".

...

...

P   Le pregunto, doctora: Diga si usted puede decir o no cuando Mara, cuando María Ramos llega al hospital ella estaba de parto, si usted puede decir eso.

R   Sí, puedo decir.

P   ¿Estaba o no estaba?

R   No estaba de parto.

P   ¿Por qué no estaba de parto?

R   Bueno, primero, se anota que tiene contracciones irregulares. Está en 2 centímetros, 80% de borramiento. Así que no está de parto.

P   No está de parto. Muy bien. Usted ahorita mencionó, doctora − a otra que yo le hice −, que el doctor completó, ejecutó, llevó a cabo su plan de llevar este parto por la vía vaginal. ¿Cómo usted sabe eso, doctora? ¿Cómo usted sabe que él lo completó ese plan?

R   ¿Qué lo ejecutó? Primero, lo ejecutó − pág. 25, orden médica − donde se aplica Prostin gel, 2 gramos de Prostin gel intracervical. La Prostin gel se utiliza para inducir contracciones uterinas e inducir parto.

...

...

Lcdo. Ramírez Lugo

P   Usted habló de 2 gramos... la orden médica dice 2 gramos de Prostin gel. ¿Qué tiene que decir usted en cuanto a esa dosis, doctora, si algo.

R    *La dosis no es terapéutica y la ruta no es apropiada. Terapéuticas son las dosis que se utilizan generalmente en los humanos, estudiadas y aprobadas. La dosis terapéutica es 2 miligramos, y para dosis de 2 miligramos la ruta es vaginal...".*

En cuanto al estándar de la medicina, el Dr. Pérez Gumá reconoció cuál era la buena práctica en estos casos. No obstante, declaró que él no actuó conforme a la recomendación del Colegio Americano de Obstetras-Ginecólogos, por ser un médico muy experimentado en ese asunto y que dicha realidad le permitía desvincularse de la misma y realizar un parto "breech" por la ruta vaginal. Sin embargo, igualmente reconoció que –como en estos momentos él no practicaba la obstetricia–, de tener que realizar uno, haría un parto por cesárea de venir el bebé de nalgas. (Véase pág. 197 de la Transcripción del Juicio en su Fondo).

Además, uno de los peritos de los demandados-apelados concurrió en que el parto "breech" mediante cesárea es el más indicado cuando se ha identificado –con anterioridad al momento del parto– que el feto viene de nalgas. (Véase pág. 217 de la transcripción del juicio).

Del tracto de los hechos advertimos que el patrón observado durante el embarazo, en específico en los dos últimos sonogramas, es que la bebé se presentaba de nalgas "breech". Por consiguiente, es prudente deducir que las probabilidades de que durante el proceso del parto la bebé se posicionara de nalgas eran considerablemente altas, o sea, era razonablemente previsible. Ante este marco, es indiscutible que el Dr. Pérez Gumá debió planificar y realizarle una cesárea a la señora Ramos Marrero y no un parto por la ruta vaginal. El galeno, ante el manifiesto cuadro prenatal, no sólo debió prever el cambio de posición, sino que debió ceñirse al estándar médico reconocido para el año 2003. Al no proceder de conformidad a lo antes indicado, el Dr. Pérez Gumá actuó de forma negligente, ya que se desvió de la buena práctica de la medicina. Recalcamos que su deber era anticipar y satisfacer las exigencias generalmente reconocidas por la propia profesión médica conforme al estado de conocimiento de la ciencia y la práctica prevaleciente en la rama de obstetricia-ginecología. La mala práctica del Dr. Pérez Gumá fue ocasionada por la falta de previsión.

Es menester señalar que la vasta experiencia que pueda tener un médico no es razón suficiente para apartarse del debido proceder médico y regirse por los estándares reconocidos para su especialidad.

De otra parte, no podemos así concluir con respecto al tratamiento prenatal que recibió la señora Ramos Marrero. Del expediente y de la transcripción surge que el tratamiento para la condición de oligohidramnios fue el correcto. Aunque existen documentos en el expediente que señalan como una complicación la existencia de oligohidramnio severo, [1] no es menos cierto que los sonogramas realizados reflejan un AFI de 7.2 y luego de 6.6, pero en ninguno de ellos el radiólogo indicó que la reducción del líquido amniótico era una severa. (Véanse págs. 264 y 308 del apéndice del recurso). Además, el testimonio de la perito de los demandantes-apelantes fue debidamente impugnado. Veamos.

En el juicio, la Dra. Carmen M. Ortiz Roque manifestó que la señora Ramos Marrero padecía de la condición de oligohibramnios. Señaló, además, que es una condición de muy alto riego, la cual requiere que el obstetra tome las siguientes medidas de cuidado: (1) vigilancia prenatal extrema, que incluye hacer perfiles biofísicos semanales; (2) el doctor debe ofrecer adelantar el parto; y (3) proveerle a la paciente corticoesteroide para acelerar el pulmón fetal.

Conforme lo declarado, la perito concluyó que el Dr. Pérez Gumá incumplió con el estándar de la medicina, ya que sólo recomendó descanso en cama y aumento en la ingesta de líquido. Añadió que a pesar de que el doctor comenzó a verla y examinarla con más frecuencia, éste sólo realizó pruebas de bienestar fetal, mediante el método de non-stress test (examen que alegadamente no es el recomendado) y que faltó a su deber de realizar un sonograma oportunamente. En esencia, puntualizó que ninguna de las medidas eran las indicadas para tal condición.

No obstante, la perito —durante el contrainterrogatorio—, fue refutada con la literatura que ella misma utilizó para establecer la negligencia del Dr. Pérez Gumá. En lo documentos se establece que un AFI de 5 cc, generalmente, se considera un volumen adecuado de líquido amniótico. Por tanto, si la señora Ramos Marrero reflejó en los últimos dos sonogramas un AFI de 7 (ambos índices se redondearon a 7) ella tenía un volumen adecuado. Ante esta determinación, no es correcto que la condición de la señora Ramos Marrero era una grave ni que las medidas cautelares que la Dra. Carmen M. Ortiz Roque señaló eran de estricta aplicación a la situación de autos.

Valga mencionar que todos los peritos y testigos de los demandados-apelados reafirmaron el correcto proceder del galeno e indicaron que las expresiones de Dra. Carmen M. Ortiz Roque eran totalmente erróneas. (Véase págs. 201-203; 207-209; 224-225; 227-228 de la transcripción). Consecuentemente, concedemos deferencia al TPI en cuanto a la apreciación de la prueba en esta situación en particular y determinamos que los cuidados que el Dr. Pérez Gumá desplegó, hacia la señora Ramos Marrero, fueron unos adecuados y cónsonos con el estándar médico.

Ya establecida la negligencia del Dr. Pérez Gumá, al realizar el parto "breech" por la ruta vaginal, debemos resolver por cuáles daños, si alguno, el galeno responde.

Como mencionamos, el TPI determinó que no existía nexo causal entre los daños sufridos y los actos negligentes del doctor. Este razonamiento es parcialmente correcto.

Luego de evaluar los testimonios de los peritos de ambas partes, resulta ineludible prescribir que —en efecto— no existe nexo causal entre la condición de hipotonia y escoliosis con la inducción y ejecución del parto "breech". Así lo demostró la literatura presentada en evidencia; [2] el contrainterrogatorio de la perito de los demandantes-apelantes, específicamente cuando la enfrentaron con el Informe del Dr. DeMario; y la prueba testifical de los peritos de los demandados-apelados. Veamos.

El médico que trató a la niña Andrea Russé Ramos (Dr. De Mario), en Connecticut Childrens Hospital, rindió un informe en el que opinó que se desconocía la procedencia de las condiciones que padece la menor (hipotonia y escoliosis), en otras palabras, que eran idiopáticas. (Véanse págs. 73-75 de la Transcripción del Juicio en su Fondo)

El Dr. John Flynn, uno de los médicos que evaluó a la menor por la condición de hipotonia y escoliosis, declaró que Andrea Russé Ramos sufre de una condición de deformidades musculoesqueletales (hipotonia y escoliosis), cuyo origen no se pudo dilucidar o detectar la causa de las mismas. Además, indicó que la escoliosis no es congénita, pero la hipotonia sí. A igual conclusión llegaron los Shriners, organización masónica, que tienen múltiples hospitales en los Estados Unidos y que fueron los que refirieron a la niña al Dr. Flynn. (Véanse págs. 142, 145-146, 148-149, 152 de la transcripción).

El Dr. Pablo Hugo Marrero Ortiz, otro testigo de los demandados-apelados que examinó a la menor, declaró que no se sabe qué condición, si alguna, causó la hipotonia y escoliosis que sufre la niña. Indicó que la niña aparenta haber tenido una hipotonia que ya la acarreaba fetalmente y la fue desarrollando hasta que nació. En otras palabras, es una hipotonia congénita. También señaló que dicha condición no tiene relación alguna con el tratamiento brindado, ya que el evento de llevar a cabo un parto y cuidado prenatal no hubiese alterado de ninguna forma significativa la condición que ésta tenía y que aún tiene en la actualidad. (Véanse págs. 251-253 de la transcripción). Tampoco entiende que la escoliosis fue producida por el parto, ya que ésta fue desarrollándose como consecuencia de la hipotonia. (Véanse págs. 253-254 y 256 de la transcripción).

Por otro lado, las declaraciones de los peritos de los demandados-apelados también fueron contundentes en cuanto a la ausencia de nexo causal entre el parto "breech", el tratamiento prenatal y las condiciones de hipotonia

y escoliosis.

El Dr. Alberto De La Vega Puyol aclaró que *un bebé que tenga oligohidramnios o que nazca de "breech" no por eso va a tener hipotonia. Es que los bebés que tienen hipotonia tienden a ponerse más frecuentemente de nalgas. No es que el "breech" cause... o nacer de "breech" cause eso; es que simplemente al bebé tener esa condición, que ya la tenía, tienden a ponerse de nalgas en vez de cabeza. Segundo, la escoliosis —la escoliosis— de este bebé puede... digo, puede no, es obvio que no fue causado por el oligohidramnios. La escoliosis se ha asociado a casos de oligohidramnios severo que ocurren desde temprana edad. Ninguna de las condiciones se dio en este caso.* También mencionó que *no hay nada en la literatura que diga que el oligohidramnios o el parto de "breech" producen ni escoliosis ni hipotonia. Sí hay una relación en el sentido de que —como mencioné antes—, los bebés con hipotonia tienden a sentarse. Eso es otra... eso es una cosa diferente, no es que el parto o el oligohidramnios produzcan esas dos condiciones.* (Véanse págs. 205, 211 de la T.P.O.).

Dicho perito también impugnó efectivamente el testimonio de la Dra. Carmen M. Ortiz Roque en cuanto a la literatura de la cual ella hace referencia.

**Examen Directo del Dr. Alberto De La Vega Puyol:** (págs. 212-213 de la T.P.O.).

P *Bien, en el Exhibit 4. Doctor, aquí se ha alegado que esa tabla que dice 31-7, okay, es un indicativo —por la doctora Carmen Ortiz Roque — de que tanto la condición de escoliosis como la hipotonia están relacionadas con el oligohidramnios.*

R *En la Tabla 31-7, que dice "Anomalías congénitas asociadas a oligohidramnios", no se refiere a que esos anomalías que están ahí son causadas por oligohidramnios, sino que frecuentemente cuando un bebé tiene, por ejemplo, síndrome de Down — como dice entre ellas — o trisomía 18, o el síndrome de Turner, que son enfermedades genéticas, que frecuentemente eso se ve acompañado de poco líquido; pero no es que el poco líquido causara esto, obviamente no.*

A igual conclusión arribó el Dr. Carlos A. Robles Llompart. Éste expresó que cuando un bebé viene de nalgas, el sacarlos por cesárea o por la ruta vaginal no va a cambiar el hecho de que tenga o adquiera la condición de hipotonia o de escoliosis. (Véanse págs. 231-232 de la T.P.O.).

Quedó claro que existe consenso en cuanto a esta situación en específico. Pudimos apreciar que todos estos testimonios, periciales y de los doctores que evaluaron y trataron a la niña, concuerdan en que las condiciones de hipotonía y escoliosis que presenta Andrea Russé Ramos son de origen desconocido, o sea, idiopáticas.

En vista de lo anterior, es razonable disponer que no existe vínculo alguno entre el parto de nalgas que realizó el Dr. Pérez Gumá con estas dos condiciones. Siendo así, no podemos imponerle responsabilidad por los daños que sufrieron los demandantes-apelantes como consecuencia de estas dos condiciones. Recordemos que para poder imponer responsabilidad a una persona al amparo del Art. 1802 del Código Civil, *supra*, tienen que coexistir tres requisitos y la ausencia de alguno de ellos impide que se constituya una causa de acción y una obligación a indemnizar el daño sufrido.

No obstante, la decisión arribada no implica que el acto negligente del Dr. Pérez Gumá no generó daños indemnizables. Como establecimos, una de las consecuencias de la inducción del parto y el nacimiento de la bebé por la ruta vaginal fue infligir los siguientes daños: (1) contracciones uterinas titánicas; (2) hiperestimulación, que quiere decir que la matriz se está contrayendo sin parar; y (3) durante el parto, el feto padeció de taquicardia con poca variabilidad, que es un signo de malestar fetal y de falta de oxígeno en el feto. Además, la bebé tuvo equimosis en los glúteos; laceración en los muslos y en la vulva de la bebé.

Los primeros tres daños fueron producidos por el Prostin Gel que el Dr. Pérez Gumá le aplicó a la señora Ramos Marrero para estimular o inducir contracciones. Explicamos.

Se desprende con claridad, tanto de la transcripción como del apéndice del recurso de apelación, que la dosis ordenada y aplicada a la señora Ramos Marrero fue de 2 gramos. (Véase pág. 33 de la T.P.O. y la pág. 428 del apéndice del recurso). Como veremos este proceder constituyó un acto negligente, el cual se encuentra vinculado la negligencia de planificar y ejecutar un parto "breech" por la ruta vaginal.

Es menester señalar que el Dr. Pérez Gumá testificó que la dosis ordenada y aplicada fue de **2 miligramos**. No obstante, el expediente no refleja ni concuerda con lo declarado. Al comparar los documentos contenidos en el expediente médico de la señora Ramos Marrero con la orden médica, podemos razonablemente inferir que el medicamento prescrito fue de Prostin Gel **2 gramos**. Esta determinación se debe a que la forma en que el galeno traza la abreviatura de gramos (g) es parecida a las palabras que contienen esa letra en sus documentos. No tenemos razón para concluir de forma diferente.

Conforme el testimonio de la perito de los demandantes-apelantes, la dosis adecuada y aprobada de Prostin Gel es de 2 miligramos, lo que constituye una terapéutica. **No así, la aplicada en el caso de autos**. De lo anterior podemos colegir que, en el contexto discutido, el Dr. Pérez Gumá no ejerció aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución que las circunstancias del caso exigían, para no exponer a la señora Ramos Marrero y a la bebé a riesgos previsibles e irrazonables de daños. La prueba demostró que este acto de descuido constituyó la consecuencia razonable y ordinaria de: (1) las contracciones uterinas titánicas que sufrió la señora Ramos Marrero, (2) la hiperestimulación, y (3) la taquicardia con poca variabilidad que sufrió el feto durante el parto. [3] (Véanse págs. 36-38 de la Trascripción del Juicio en su Fondo). **La prueba en cuanto a este aspecto no fue refutada por los demandados-apelados.**

En vista de todo lo anterior, es ineludible concluir que —ante la presencia de prueba que corroboró el nexo causal—, el Dr. Pérez Gumá es responsable y está obligado a indemnizar a los demandantes-apelantes por los daños sufridos.

Es de señalar que la equimosis en los glúteos, laceración en los muslos y en la vulva de la bebé también fueron daños que la niña sufrió como consecuencia del parto "breech", por los que el Dr. Pérez Gumá también responde.

Además, como mencionamos, la bebé desarrolló un hematoma del esternocleidomastoideo. Éste daño a su vez provocó un acortamiento del músculo del cuello izquierdo, lo que culminó en una tortícolis que requirió terapias. Éste daño, a pesar de que los peritos de los demandados-apelados no lo vincularon con el parto "breech", la literatura presentada como evidencia indica que éste puede ser ocasionado por dichos partos. (Véase pág. 123 del apéndice). Con estos antecedentes, no podemos menos que otorgarle credibilidad al testimonio de la Dra. Carmen M. Ortiz Roque (págs. 42-44 de la T.P.O.) y a la literatura. Colegimos que existe nexo causal entre todos esos daños y el acto negligente del Dr. Pérez Gumá, a pesar de que al día de hoy esta condición desapareció.

Consecuentemente y conforme a todo lo aquí expresado, concluimos que el TPI incidió en la apreciación que de la prueba realizó y, por lo tanto, fue incorrecta la decisión de que la prueba no evidenció nexo causal entre el acto negligente y los daños sufridos. Esta fue una absoluta que no corresponde a la realidad del caso de autos.

## IV

Atendidos los fundamentos que anteceden, revocamos la decisión de Instancia. Por consiguiente, disponemos que el Dr. Pérez Gumá fue negligente al efectuar el parto "breech" por la ruta vaginal, ya que este proceder está reñido con el estándar médico. Éste debió prever que la bebé podía cambiar de posición y colocarse de nalgas, máxime cuando los últimos dos sonogramas así lo reflejaban. Por ello, el galeno debió planificar y realizarle a la

171

señora Ramos Marrero una cesárea.

No obstante, resolvemos que éste no fue negligente en el tratamiento prenatal. Los cuidados y recomendaciones brindadas fueron cónsonos con el estándar médico en la especialidad de la ginecología y obstetricia.

Conforme a la decisión arribada, el Dr. Pérez Gumá responde por los daños ocasionados como consecuencia razonable del parto "breech" por la ruta vaginal (existencia de nexo causal), los cuales son los siguientes: (1) las contracciones uterinas titánicas que sufrió la señora Ramos Marrero, (2) la hiperestimulación, (3) por la taquicardia con poca variabilidad que el feto sufrió durante el parto, (4) equimosis en los glúteos que tuvo la bebé, (5) las laceración en los muslos y en la vulva de la bebé, (6) el hematoma del esternocleidomastoideo que desarrolló la menor Andrea Russé Ramos, que a su vez provocó un acortamiento del músculo del cuello izquierdo, que culminó en una tortícolis que requirió terapias, y (7) por los gastos incurridos en los tratamientos que la menor necesitó para el mejoramiento de los daños y condiciones antes mencionados. Además, no podemos descartar que toda esta realidad causó, tanto a los padres de la niña como a ella misma, angustias y sufrimientos mentales indemnizables. (Véase *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987).

Con lo antes dicho, queda claro que el Dr. Pérez Gumá no responde por la condición de hipotonía y escoliosis que sufre Andrea Russé Ramos, ya que no existe nexo causal.

Consecuentemente, devolvemos los autos al TPI para que éste determine la cuantía a la que tienen derecho los demandantes-apelantes en concepto de indemnización por los daños sufridos. El análisis en cuestión se verificará conforme al dictamen aquí arribado, el derecho aplicable y los hechos del caso.

Por último, se elimina la penalidad impuesta a los demandantes-apelantes de satisfacer la cantidad de $2,000 por concepto de honorarios de abogado.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2009 DTA 88

**1.** Ver páginas 527, 530, 558 del Apéndice del Recurso de Apelación. Estos documentos son más bien de trámites internos del Hospital San Pablo.

**2.** Pudimos constatar que la literatura utilizada en el caso de autos instruye que los niños que persistentemente se encuentran de nalgas "breech" tienen más riesgos de presentar complicaciones y enfermedades. En otras palabras, no se refiere a que el niño desarrolla o adquiere las condiciones de salud porque el médico realice el parto de nalgas por la ruta vaginal. (Véanse págs. 106, 108 del apéndice).

**3.** La perito de los demandantes-apelantes declaró que la condición del feto durante el período de duración del Prostin Gel es uno deteriorado. El trazado del feto es uno "non-reassuring", que quiere decir no se puede asegurar que el bebé esté bien. Se tienen unos trazos omniosos, que es taquicardia por falta de oxígeno y pérdida de variabilidad, o sea, con posible compromiso neurológico hasta donde se podía evaluar con las herramientas que se utilizaron. (Pág. 39 de la TPO).